No. 21-2913

UNITED STATES COURT OF APPEALS

FOR THE SEVENTH CIRCUIT

―――――――――――――――

CATRINA BRAGG

Plaintiff-Appellant,

v.

MUNSTER MEDICAL RES. FDN., d/b/a COMMUNITY HOSPITAL

Defendant-Appellee.

―――――――――――――――

Appeal from the United States District Court for the
Northern District of Indiana, Hammond Division, No. 2:19-cv-00209
(James T. Moody, J.)

―――――――――――――――

PLAINTIFF-APPELLANT'S BRIEF AND REQUIRED SHORT APPENDIX

―――――――――――――――

LISA M. STAUFF, ESQ.
LAW OFFICES OF LISA M. STAUFF
53 West Jackson Blvd.
Suite 624
Chicago, Illinois 60604
(312) 212-1036
LStauff@StauffLaw.com
*Counsel of Record for Plaintiff-Appellant*

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: ~~21-2913~~

Short Caption: ~~Bragg v. Munster Medical Research Foundation, Inc., d/b/a Community Hospital~~

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.   The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[ ]  **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

   ~~Catrina Bragg~~

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

   ~~Law Offices of Lisa M. Stauff~~

(3)    If the party, amicus or intervenor is a corporation:

   i)       Identify all its parent corporations, if any; and

         ~~n/a~~

   ii)      list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

         ~~n/a~~

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

   ~~n/a~~

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

   ~~n/a~~

---

Attorney's Signature: ~~Lisa M. Stauff~~                    Date: ~~4/7/2022~~

Attorney's Printed Name: ~~Lisa M. Stauff~~

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes [✔]   No [ ]

Address: ~~53 W. Jackson Blvd., Suite 624~~

   ~~Chicago, Illinois 60604~~

Phone Number: ~~312 212 1036~~            Fax Number: ~~312 277 3177~~

E-Mail Address: ~~lstauff@staufflaw.com, lmstaufflaw@gmail.com, cjwhite@staufflaw.com~~

                                                                          rev. 12/19 AK

# TABLE OF CONTENTS

TABLE OF AUTHORITIES..................................................................................... 2

JURISDICTIONAL STATEMENT ........................................................................ 3

STATEMENT OF THE ISSUES ............................................................................ 3

STATEMENT OF THE CASE ............................................................................... 4

    I.   Statement of Facts ........................................................................................ 4

    II.  Proceedings in the District Court ............................................................. 15

ARGUMENT ........................................................................................................ 16

    I.   Summary of Argument ............................................................................... 16

    II.  Standard of Review .................................................................................... 17

    A.  The District Court improperly disregarded facts submitted by Ms. Bragg which show racial animus during the decision-making process, and establish grounds upon which a reasonable jury could find Community Hospital's stated reason for termination was pretext for discrimination on the basis of race. ................................ 18

    B.  The District Court Erred in Granting Summary Judgment on Ms. Bragg's Title VII Retaliation Claim, Where Material Facts Remain in Dispute and All Inferences Were Drawn In Defendant's Favor ...................................................... 28

CONCLUSION ...................................................................................................... 31

PROOF OF SERVICE .......................................................................................... 33

CERTIFICATE OF COMPLIANCE WITH FRAP RULE 32(a)(7), ................................... 34

FRAP RULE 32(g) and CR 32(c) ....................................................................... 34

CIRCUIT RULE 30(d) STATEMENT ............................................................... 35

REQUIRED SHORT APPENDIX....................................................................... 36

# TABLE OF AUTHORITIES

## Cases

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). ...............................................................17

*Andrews v. CBOCS W., Inc.*, 743 F.3d 230, 234 (7th Cir. 2014)............................................19

*Belcastro v. United Airlines, Inc.*, 17-cv-01682, at *17 (N.D. Ill. Mar. 28, 2022)..............................23

*Boss v. Castro*, 816 F.3d 910, 918 (7th Cir. 2016) .......................................................28

*Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006)......................................30

*Cavender v. Sunbelt Rentals, Inc.*, 2007 U.S. Dist. LEXIS 78910 *2, 2007 WL 3119693 (S.D. Ind. 2007) .......................................................................................................17, 18

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) ................................................17

*Dandy v. United Parcel Service, Inc.*, 388 F.3d 263, 272 (7th Cir. 2004). ...........................22

*Everroad v. Scott Truck Sys., Inc.*, 604 F.3d 471, 477–78 (7th Cir.2010)................................19

*Gracia v. SigmaTron Int'l, Inc.*, 842 F.3d 1010 (7th Cir. 2016)............................................30

*Hague v. Thompson Distribution Co.*, 436 F.3d 816, 823 (7th Cir. 2006) ..............................27

*Hill v. Tangherlini*, 724 F.3d 965, 968 (7th Cir. 2013)...............................................22

*Hobbs v. Sloan Valve Co.*, 2015 U.S. Dist. LEXIS 89629, *19 (N.D. Ill. 2015) ........................17

*Joll v. Valparaiso Cmty. Sch.*, 953 F.3d 923, 929 (7th Cir. 2020).........................................18

*Jones v. Res-Care, Inc.*, 613 F.3d 665, 671 (7th Cir. 2010) .............................................29

*Kahn v. U.S. Secretary of Labor*, 64 F.3d 271, 278 (7th Cir. 1995) .....................................19

*Lewis v. Wilkie*, 909 F.3d 858, 866 (7th Cir. 2018)....................................................28

*Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 563 (7th Cir. 2016)................................28

*McAllister v. Innovation Ventures* , 983 F.3d 963, 967 (7th Cir. 2020) ................................17

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) ............................................18

*McCoy v. WGN Continental Broadcasting Co.*, 957 F.2d 368, 370-71 (7th Cir. 1992) ..................18

*Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011). .......................17

*Ortiz v. Werner Enterprises, Inc.* , 834 F.3d 760, 764–65 (7th Cir. 2016).............................18

*Pearson v. Ill. Bell Tel. Co.*, 15 C 653, at *12 (N.D. Ill. Dec. 20, 2016) .............................18

*Peirick v. Indiana*,  510 F.3d 681 (7th Cir. 2007)......................................................25

*Sarsha v. Sears, Roebuck Co.*, 3 F.3d 1035, 1042 (7th Cir. 1993)......................................18

*Schandelmeier-Bartels v. Chicago Park Dist*, 634 F.3d 372, 383 (7th Cir. 2011).......................24

*Skiba v. Illinois Cent. R.R. Co.*, 884 F.3d 708, 719 (7th Cir. 2018).....................................19

*Taylor v. Ways. Taylor v. Ways*, 999 F.3d 478, 489 (7th Cir. 2021).....................................24

*UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011) .........................................17

*Weber v. Univ. Research Assoc., Inc.*, 621 F.3d 589, 592 (7th Cir. 2010)................................17

*Woods v. City of Berwyn*, 803 F.3d 865, 870 (7th Cir. 2015).............................................24

## Statutes

42 U.S.C. § 2000e, *et seq*...............................................................................18

28 U.S.C. §§1331 ....................................................................................4

28 U.S.C. §1291 ......................................................................................4

Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e-2.......................................4

## JURISDICTIONAL STATEMENT

Plaintiff filed her original complaint on May 31, 2019, within 90 days after plaintiff received notice from the EEOC of her right to sue. (Complaint, Dkt. 1; Right to Sue Notice, Dkt. 1-2). The district court had jurisdiction under §§1331 of the Judicial Code. [28 U.S.C. §§1331]. The federal questions presented arose under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e-2, and retaliation for protected activity, in violation of 42 U.S.C. §2000e-3(a). The Court of Appeals has jurisdiction under §1291 of the Judicial Code [28 U.S.C. §1291]. On September 17, 2021, the District Court granted summary judgment for defendant on all counts and terminated plaintiff's case. Plaintiff filed a timely notice of appeal on October 19, 2021.

## STATEMENT OF THE ISSUES

The district court granted summary judgment for defendant-appellee, Munster Medical Research Foundation, Inc., d/b/a Community Hospital, on Plaintiff Catrina Bragg's claims of discrimination on the basis of race in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e-2, and retaliation for protected activity in violation of 42 U.S.C. §2000e-3(a). Ms. Bragg appeals the district court's decision, and raises the following issues on appeal:

1. Did the district court err by failing to draw all reasonable inferences from the evidence in a light most favorable to Ms. Bragg, the non-movant, where the district court granted summary judgment on Ms. Bragg's Title VII race discrimination claim?

2.  Did the district court err by failing to draw all reasonable inferences from the evidence in a light most favorable to Ms. Bragg, the non-movant, where the district court granted summary judgment on Ms. Bragg's Title VII retaliation claim?

## STATEMENT OF THE CASE

### I.   Statement of Facts

Plaintiff-Appellant, Catrina Bragg, is an African American woman and a Registered Nurse ("RN"). Ms. Bragg received her bachelor's degree in Nursing in January 2018, and earned her license in June 2018. (Dkt. 36-1, ¶4). On or about September 10, 2018, Ms. Bragg began her employment at Defendant, Community Hospital, Ms. Bragg's first job as an RN. (Dkt. 36-1, ¶5). Community Hospital hired Ms. Bragg to work in Defendant's 4 South Renal department. Community Hospital requires newly licensed RNs to go through a 90-day orientation program, in which they are trained and evaluated weekly by a preceptor. (Dkt. 36-1, ¶¶18-19). Preceptors are experienced RNs who stay with orientee-RNs "a great majority of time observing the orientee's performance" during the entire ninety-day orientation period (Id., ¶19). Preceptors prepare orientee progress forms and participate in biweekly meetings with their orientee-RNs to "discuss and review the orientee's [] performance, progress, problems, areas of concern and any incidents that warrant attention." (Id., ¶26). Dan Heredia, a Community Hospital Educator, typically attends these meetings, and prepares summaries of the substance of the meetings. (Id., ¶ 27).

In 4 South Renal acute care unit, RNs picked the patients they wanted to work with at the beginning of each shift. (Dkt. 43-1, ¶2). Each shift, Samantha Kranz, the nursing manager for 4 South Renal, generated a list of room numbers with occupied beds, and attached the list to a clipboard at the nurses' station. Occasionally Ms. Kranz would indicate the initials of the nurse she wanted to attend to that particular room, but otherwise RNs chose patients on a first-come-first-serve basis, at the start of their shift. Sometimes the nurses traded patients. (Dkt. 43-1, ¶ 2(a-e); Deposition of Catrina Bragg, Dkt. 36-2, 51:14-52:15,). The clipboard list had only room numbers; it did not have patient names, but RNs generally knew who was in each room and they could look up a room in the EPIC computer system if they were unsure. (Dkt. 43-1, ¶ 2(b-h)). Orientees, such as Ms. Bragg, did not select patients. Preceptors selected patients they wanted, then assigned their orientee to specific patients within that group. (Id., ¶ 2(i-j)).

Ms. Bragg was assigned to preceptor Erin Wysocki, a white woman, when she first arrived to 4 South Renal. The first day Ms. Bragg noticed she and Ms. Wysocki were race-matched to their respective patients, i.e., Ms. Wysocki took white patients and Ms. Bragg was assigned Black and Latino patients. (Dkt. 43, ¶5). Ms. Bragg initially chalked this up to an awkward coincidence. Then Ms. Bragg was assigned her first white patient when a new admission arrived on or about September 25, 2018. Ms. Bragg began tending to that patient but when Ms. Wysocki came to observe Ms. Bragg's patient care tasks, Ms. Wysocki immediately took the patient away from Ms. Bragg. (Dkt. 43-1, ¶ 4; Dkt. 36-2, 71:22-73:17; Dkt. 36-3, pp. 19-20). Ms. Bragg asked why, and Ms. Wysocki did not respond. The patient was stable, and presented no known difficulties that

warranted Ms. Wysocki's sole attention. (Dkt. 36-2, 72:3-73:17). Ms. Bragg became

concerned her assignment to minority patients was intentional, so she told Ms. Wysocki

she was "capable of taking care of patients of all races." (Dkt. 43-1, ¶¶3-5; Dkt. 36-3, p.

57). Ms. Wysocki walked away without responding. (Exh. 1, ¶5).

Later that day or the next day, Ms. Wysocki became disproportionately irate at Ms.

Bragg when an IV became disconnected from a patient. (Dkt. 43-1, ¶¶6-13). Ms.

Wysocki berated Ms. Bragg, spittle flying, in front of the patient and his family. (Id.,

¶¶10-12). The rest of the day Ms. Wysocki ignored Ms. Bragg, did not accompany her

into patient rooms, and did not do a progress report or a debrief at the end of the shift.

(Dkt. 43-1, ¶18).  Ms. Bragg was shocked, and discussed the incident with Sarah

Musson, a fellow orientee-RN. (Dkt. 43-1, ¶¶19-24).  Ms. Musson said an IV detaching

was "not a big deal" and was easily fixed; in fact, Ms. Musson reported that it recently

happened on one of her patients and no one yelled at her. (Id., ¶24).

On the advice of Ms. Musson, Ms. Bragg reported Ms. Wysocki to Mr. Heredia. (Dkt.

43, ¶11). Ms. Bragg told Mr. Heredia about Ms. Wysocki's disproportionate and

unchecked rage over the IV, and about Ms. Wysocki assigning only minority patients to

Ms. Bragg. (Dkt. 43, ¶12). Ms. Bragg referenced Defendant's zero tolerance policy

against "intimidation, bullying, and discrimination." (Dkt. 43, ¶¶ 26-32; Dkt. 36-1, pp.

15-16).

Ms. Kranz spoke with Ms. Bragg about the incident later, and excused Ms.

Wysocki's behavior as stress from Ms. Wysocki's upcoming wedding. (Dkt. 43, ¶13).

Ms. Wysocki never apologized for the incident. Instead, Ms. Wysocki noted in Ms.

Bragg's evaluation for the week that Ms. Bragg "needed some work [] in regard to IV tubing" despite the fact that the IV detaching had nothing to do with Ms. Bragg—the IV was on the floor when Ms. Bragg and Ms. Wysocki entered the patient's room. (Dkt. 36-1, p. 33; Dkt. 43-1, ¶¶8-9).

Within a few days, Ms. Kranz assigned Ms. Bragg to a new preceptor, Brittany Arrigo. (Id.) Under Ms. Arrigo's preceptorship, Ms. Bragg was no longer race-matched to her patients, but Ms. Arrigo demonstrated in other ways that a patient's or a co-worker's race played a role in Ms. Arrigo's professional thinking. Ms. Bragg saw and heard Ms. Arrigo mock African American patients with exaggerated speech and vulgar language. (Dkt. 43, ¶ 14). Ms. Bragg saw Ms. Arrigo sing along to sexually explicit rap music at the nurses' station—music Ms. Arrigo played only when Ms. Bragg was at the nurses' station. (Id.). Ms. Arrigo was not alone. Other white nurses also mocked the speech and mannerisms of African American patients. (Id.)

Ms. Bragg openly disdained this conduct. For example, when Ms. Arrigo laughed at how an African American patient's amputated arm looked like "a stick" because it was "skinny and brown," Ms. Bragg immediately told her this was "not funny," instantly dampening the laughter Ms. Arrigo's characterization caused. (Dkt. 43-1, ¶¶ 35-36; Dkt. 36-1, p. 58). Ms. Bragg frowned, looked at the nurses in shock, and/or left the nurses'

station when Ms. Arrigo played rap music, and when co-workers mocked African American speech patterns. (Dkt. 43-1, ¶ 35).[1]

Ms. Bragg observed that when white nurses were at the nurse's station, Ms. Arrigo played Britney Spears and country music. (Dkt. 36-1, pp. 116, ¶35; Dkt. 36-2, 83:4-84:5). Ms. Musson complained about the Britney Spears and country music, and shut it off on multiple occasions, angering Ms. Arrigo. (Dkt. 36-1, 83:4-84:5).

Ms. Arrigo submitted orientation progress reports containing false and/or misleading information regarding Ms. Bragg's job performance. (Dkt. 43-1, ¶¶ 37-45; Dkt. 36-1, Dkt. 36-2, 42:3-43:4, 44:3-45:16). For example, Ms. Arrigo reported that Ms. Bragg told a patient that the drug Toradol was addictive and that Toradol was an antihistamine. Neither of these events happened. (Dkt. 43-1, ¶¶37-44; Dkt. 36-2, 44:3-45:4). Ms. Bragg knows this medication well because she is allergic to it—she would never describe it as addictive or as an antihistamine. (Dkt. 36-2, 45:4; Dkt. 43-1, ¶42). Another evaluation from Ms. Arrigo reported Ms. Bragg misunderstanding dosages for Fentanyl, and this also never happened. (Dkt. 36-2, 45:5-16; Dkt. 43-1, ¶45).

In early November 2018, Ms. Bragg made a medication error while under Ms. Arrigo's direct, in-room supervision. Ms. Bragg voluntarily filled out a MIDAS report of the incident. (Dkt. 43-1, ¶46; Dkt. 36-2, 75:17-79:12). Yet, a few days prior,  Kim Raddatz told Ms. Bragg and Ms. Arrigo that Ms. Raddatz had infused a medication that should

---

[1] Dkt. 43-1, ¶35 references two parts of the record which are located as follows: "Def. SMF, Exh. 16, Interrog. No. 6" is located at Dkt. 36-3, pp. 57-58; "Def. SMF, Exh. 2, 89:18-91:12" is located at Dkt. 36-2, pp. 90-91.

have been administered to the patient by injection into the gluteal muscle. Ms. Raddatz also told Ms. Bragg and Ms. Arrigo that she did not submit the required MIDAS report for this incident. (Dkt. 36-2, 85:25-87:14). Medications are absorbed more quickly when administered intravenously than by gluteal muscle injection, therefore a MIDAS report should have been submitted and the attending physician informed so that the patient could be properly monitored. (Dkt. 36-2, 84:4-14).

On November 14, 2018, Ms. Kranz assigned Ms. Raddatz as Ms. Bragg's preceptor. (Dkt. 43, ¶25). Ms. Raddatz immediately began a pattern of doing everything she could to distract and annoy Ms. Bragg, including stomping her feet while Ms. Bragg worked. If Ms. Bragg made a small mistake, instead of coaching Ms. Bragg, Ms. Raddatz yelled at Ms. Bragg in front of patients. (Dkt. 43-1, ¶¶53-57). Ms. Raddatz regularly hit Ms. Bragg on the arm as a way to emphasize a point. Ms. Raddatz continued this behavior even after Ms. Bragg told her to stop. (Dkt. 36-2, 91:24-93:13). Soon Ms. Raddatz reduced Ms. Bragg's patient load, despite Ms. Bragg showing proficiency at handling four patients at a time by the time Ms. Raddatz was assigned to her. (Dkt. 36-3, pp. 35-37). When Ms. Bragg remarked she was "bored," Ms. Raddatz "dumped the whole team off on [Ms. Bragg]." (Dkt. 36-2, 46:9-48:3). This is reflected in Ms. Bragg's November 15, 2018 evaluation. (Dkt. 36-3, p.41).

Ms. Bragg saw Ms. Raddatz handle patients roughly. On two occasions Ms. Bragg witnessed Ms. Raddatz force medication down unwilling patients' throats. (Dkt. 36-2, 97:12-98:24). Ms. Bragg reported these allegations to Ms. Kranz, in Ms. Kranz's office, in

early-December 2018. Ms. Kranz fervently denied Ms. Raddatz was "mean to patients." (Dkt. 43-1, ¶¶61-62).

Ms. Raddatz took detailed notes of Ms. Bragg's job performance throughout the day, telling Ms. Bragg she was creating "legal records." (Dkt. 43, ¶30). Ms. Raddatz yelled at Ms. Bragg in front of patients. (Id., ¶¶25, 28) Ms. Bragg told Ms. Raddatz she knew Ms. Raddatz was trying to get her fired by documenting falsehoods regarding Ms. Bragg's job performance, and Ms. Raddatz did not deny this. (Id., ¶30). On or about November 26, 2018, Mr. Heredia told Ms. Bragg she would have to demonstrate "100% compliance and accuracy" in certain patient care tasks. (Dkt. 36-2, 49:7-50:8; Dkt. 36-3, pp. 44).

Ms. Bragg saw Ms. Raddatz and Mr. Heredia high-five in the hallway after Ms. Raddatz showed Mr. Heredia a form Ms. Raddatz had just tried to get Ms. Bragg to sign, which memorialized as a mistake an action taken by Ms. Bragg to prevent a medication error where Ms. Bragg caught a computer error, redid a calculation, showed Ms. Raddatz the math, and administered the correct dose to the patient. Ms. Bragg knew the form and the high-five were about her because minutes earlier, she had refused to sign the same form. (Dkt. 43-1, ¶¶ 53-59; Dkt. 36-2, 93:14-94:3).

Ms. Bragg talked to Ms. Kranz about Ms. Raddatz's behavior intended to distract and annoy Ms. Bragg while she provided patient care, and about Ms. Raddatz documenting falsehoods in orientation evaluations. Ms. Kranz yelled at Ms. Bragg and denied Ms. Bragg's allegations. Then, Ms. Kranz forced Ms. Bragg to sign an evaluation form Ms. Bragg specifically told Ms. Kranz contained false information. (Dkt. 43-1, ¶¶49, 60-65).

Neither Mr. Heredia, Ms. Meyer, nor Debbie Brandt, Director of Human Resources, witnessed Ms. Bragg perform patient care tasks. (Dkt. 43-1, ¶¶71-74). Ms. Kranz observed Ms. Bragg provide patient care on one occasion, when Ms. Kranz entered a patient room to speak with Ms. Raddatz while Ms. Bragg adjusted an IV. That notwithstanding, Ms. Kranz was never present when Ms. Bragg provided patient care or performed administrative tasks. (Dkt. 43-1, ¶73). The only individuals consistently present when Ms. Bragg performed patient care or administrative tasks were Ms. Wysocki, Ms. Arrigo, and/or Ms. Raddatz. (Id., ¶ 74).

Near the end of Ms. Bragg's orientation, Ms. Bragg was working with a patient with Ms. Raddatz when Ms. Raddatz joked with an elderly African American patient that they were "not having a hanging tonight," as Ms. Raddatz fixed an oxygen line that caught around the patient's neck while Ms. Raddatz, Ms. Bragg, and another nurse moved this patient. Ms. Bragg bitterly responded that she "couldn't believe what [she] just heard." (Dkt. 36-3, pp. 61, Interrogatory response 6(l)).

On Ms. Bragg's last day at Community Hospital, Ms. Raddatz cryptically told Ms. Bragg that Ms. Kranz "does everything for me." This conversation occurred at the nurse's station, just minutes before Ms. Kranz and Carla Meyer, the Director of Nursing, called Ms. Bragg into a meeting to fire her from Community Hospital, and transferring Ms. Bragg to Hartsfield Village, a rehabilitative skilled nursing facility owned by Community Hospital's parent company, Munster Medical Research Foundation. (Dkt. 43-1, ¶¶ 66-69).

When Ms. Meyer informed Ms. Bragg of the transfer, Ms. Meyer told Ms. Bragg she would be doing the same tasks at Hartsfield Village. Ms. Meyer and Ms. Kranz gave no explanation for the transfer, in fact, Ms. Bragg left the termination meeting not knowing why she was being transferred to Hartsfield Village. (Dkt. 36-2, 62:2-20, 63:8-16). Ms. Bragg did not tell Ms. Meyer or Ms. Kranz, in this meeting or at any other time, that she felt she was unable to handle the pace of patient care in 4 South Renal. (Dkt. 43-1, ¶69).

Ms. Bragg did not want to transfer to Hartsfield Village, so she asked about other positions at Community Hospital. Ms. Meyer said they did not want Ms. Bragg at Community Hospital. (Dkt. 43-1, ¶69; Dkt. 36-2, 63:8-16, 63:18-64:8, 65:24-66:19, 67:20-25). If Ms. Bragg had not taken the position at Hartsfield Village, she would have been unemployed. (Dkt. 36-3, pp. 88-95, ¶29; Dkt. 43-1, ¶70). Ordinarily, employees are not allowed to transfer between facilities in the first six months of employment. (Dkt. 36-3, pp. 88-95, ¶26). Deborah Brandt, Director of Human Resources, waived Defendant's six-month waiting period for new hire transfers within the Community Health facilities in order to let Ms. Bragg transfer to Hartsfield Village with only three months on the job. (Id.).

In this litigation, Community Hospital produced orientation evaluations for seven weeks of Ms. Bragg's employment. These cover the dates (all 2018): October 1 and 22, November 1, 9, 15, 26, and December 9.  (Dkt. 36-3, pp. 24-46). There are two format types for these documents: a chart which was filled out by a preceptor who scores the orientee in different categories, (Dkt. 36-3, pp. 24-31), and a one-page memo, (Dkt. 36-3, pp. 32-46),  purportedly drafted by Mr. Heredia to reflect the discussion which occurred

12

in the corresponding meeting to discuss the evaluation. (Dkt. 36-3, pp.97-103, ¶ 10). Both types of evaluations are dated and have date and signature lines for Ms. Bragg, the preceptor, the nurse educator, and the nurse manager. (Dkt. 36-3, pp. 24-46).

Between Bragg's date of hire (September 10, 2018) and November 1, 2018, Community Hospital generated five evaluations (two chart-style, three memo). All but one bear Ms. Bragg's signature. (Dkt. 36-3, pp. 24-37). From November 9, 2018 through Ms. Bragg's December 12, 2018 termination, Community Hospital generated five additional evaluations (again, two chart-style, and three memo). (Dkt. 36-3, pp. 28-31, 39-44). Ms. Bragg first learned of these documents through this litigation, not through her employment. (Dkt. 43-2,  Response to Interrogatory No. 3). Ms. Bragg's signature does not appear on any memos in this latter group of evaluations, (Dkt. 36-3, pp. 39-44), or on Ms. Bragg's last scored evaluation before termination (Dkt. 36-3, p.31).

Ms. Bragg was one of two orientee-RNs Community Hospital did not keep employed after her orientation period, over the last five years. (Dkt. 36-1, ¶10). The second was Mary Anderson, a white woman. (Id.). Ms. Anderson's evaluation dated October 11, 2019, shows Ms. Anderson receiving a score of 2.5 for "Attitude," despite the notes indicating that Ms. Anderson was argumentative when reminded about charting deficiencies, which warrants a score of 1 according to the rubric described on the form. (Dkt. 36-3, pp. 147). Ms. Anderson's evaluation dated November 12, 2019, shows that Ms. Anderson made no effort to correct the mistakes attributed to her, did sloppy work, was not grasping basic charting and time management issues after two months of orientation. (Dkt. 36-3, pp. 149-150).

13

Most of the nursing staff at Community Hospital are white, while most of the nursing staff at Hartsfield Village are African American. (Dkt. 43-1, ¶ 81; Dkt. 36-2, 69:10-14).

Ms. Bragg's wages and compensation were lower at Hartsfield Village than that paid to Ms. Bragg at Community Hospital. (Dkt. 43-3, p. 3, Initial Disclosure No. 3).

Preceptor evaluation forms put into evidence by Community Hospital reflect Ms. Bragg's assessment of the preceptor's performance only on the date of the document, and are not evaluations of the preceptor's overall performance. (Dkt. 36-2, 28:13-19, 29: 25:-33:1). If Ms. Bragg had had the opportunity to evaluate preceptors on a daily basis, the evaluations "would fluctuate on the days [Ms. Bragg] witnessed discrimination, abuse, or retaliation." (Id., 33:2-9).

Ms. Kranz and Carla Meyer, the Director of Nursing, relied upon the representations of Ms. Bragg's preceptors in concert with Mr. Heredia, to lobby Deborah Brandt, Community Hospital's head of Human Resources, to terminate Ms. Bragg's employment. (Dkt. 43, ¶¶35-36). Ms. Brandt approved the termination and Ms. Bragg's subsequent transfer to an RN position at Hartsfield Village. (Dkt. 43, ¶38).

Ms. Kranz and Ms. Meyer told Ms. Bragg that her job duties would be the same at Hartsfield Village. (Dkt. 43, ¶36). This was true to the extent that both Community Hospital and Hartsfield Village tasked Ms. Bragg with the following duties: admitting patients; discharging patients; assessing patient symptoms; administering medication; charting patient medical events; communicating with physicians, patients, and family members; responding to code blue emergencies; and treating patients in isolation. (Dkt.

43-1, ¶75).  At Hartsfield Village Ms. Bragg had triple the patient load and tended to significantly older and sicker patients compared to 4 South Renal. (Dkt, 43, ¶47; Dkt. 43-1, ¶¶77-80). Ms. Bragg was additionally responsible for: calculating and administering narcotic medication; performing blood draws for lab work; G-tube administration; communicating with hospice care; and communicating with funeral services. (Dkt. 43.1, ¶76). Despite the significantly increased workload and high-level of patient care, Ms. Bragg was so proficient that Hartsfield Village cut Ms. Bragg's mandatory orientation short. (Dkt. 43, ¶48).

## II.    Proceedings in the District Court

Ms. Bragg filed her complaint in the U.S. District Court, Northern District of Indiana, Hammond Division, on May 31, 2091. (Dkt. 1). Ms. Bragg alleged violations of Title VII of the Civil Rights Act of 1964, as amended, arising from unlawful discrimination on the basis of race, and unlawful retaliation for protected activity.

At the close of discovery, Community Hospital brought a motion for summary judgment on all counts of the complaint. (Dkt. 35). Specifically, Community Hospital argued that it terminated Ms. Bragg's employment because Ms. Bragg failed to meet Community Hospital's legitimate expectations during Ms. Bragg's ninety-day orientation period. Community Hospital also argued that there was no evidence of racial animus or retaliatory motive, and that Ms. Bragg could not establish a *prima facie* case of discrimination or retaliation under Title VII.

15

Defendant's motion was fully briefed by the parties, and on September 17, 2021, the district court ruled in Defendant's favor on all counts. Ms. Bragg timely filed this appeal.

## ARGUMENT

### I.     Summary of Argument

The case before this Court is an employment dispute arising under Title VII of the Civil Rights Act of 1964, as amended. Plaintiff, Catrina Bragg, was unlawfully terminated by Defendant, Community Hospital, as a result of discrimination on the basis of race, and in retaliation for Ms. Bragg's protected activity. Ms. Bragg brought suit and at the close of discovery, Community Hospital moved for summary judgment. The district court granted Community Hospital's motion, despite many genuine issues of material fact from which a reasonable jury could find in Ms. Bragg's favor.

Specifically, the district court disregarded facts presented by Ms. Bragg which a reasonable jury could determine showed racial animus by the individuals responsible for meticulously monitoring and evaluating Ms. Bragg's job performance during her orientation period. Additionally, the district court did not believe a reasonable jury could find in Ms. Bragg's favor on her Title VII retaliation count, where Ms. Bragg explicitly protested race-matching of patients and then escalated this complaint to management beginning in her first week of work for Defendant. The subjects of Ms. Bragg's complaints were the same (and only) individuals with direct knowledge of Ms.

Bragg's job performance, and were responsible for the evaluations upon which Ms.

Bragg's termination was based.

The district court was wrong to disregard these and many other facts presented by

Ms. Bragg in opposition to Community Hospital's motion for summary judgment. The

court may not view these incidents as dispositive, but the weight and credibility of Ms.

Bragg's factual allegations are not to be decided by the district court. For this reason,

this Court is urged to reverse the district court's ruling, and remand this matter to the

district court so that a trial on the merits may be conducted.

## II.   Standard of Review

The district court's grant of summary judgment is reviewed de novo, drawing all

inferences in the non-movant's favor. *McAllister v. Innovation Ventures* , 983 F.3d 963, 967

(7th Cir. 2020).

Summary judgment is required when "the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to a judgment as a matter of

law." Fed. R. Civ. P. 56(a); see also, *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Material facts are those that could affect the outcome of the case. *Cavender v. Sunbelt*

*Rentals, Inc.,* 2007 U.S. Dist. LEXIS 78910 *2, 2007 WL 3119693 (S.D. Ind. 2007) (citing

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).

A court must view all evidence and draw all reasonable inferences in favor of the

non-moving party in order to determine if a material fact exists. *Weber v. Univ. Research*

*Assoc., Inc.,* 621 F.3d 589, 592 (7th Cir. 2010). The court may not weigh conflicting evidence

or make credibility determinations. *Omnicare*, *Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697,

704 (7th Cir. 2011). Summary judgment is appropriate only if the record, taken as a whole, establishes no reasonable jury could find for the non-moving party. *Hobbs v. Sloan Valve Co.*, 2015 U.S. Dist. LEXIS 89629, *19 (N.D. Ill. 2015) (citation omitted).

Summary judgment is particularly inappropriate for settling issues of intent or motivation. *Sarsha v. Sears, Roebuck Co.*, 3 F.3d 1035, 1042 (7th Cir. 1993). Intent and credibility are crucial inquiries in employment disputes, warranting "added rigor" in applying the summary judgment standard. *McCoy v. WGN Continental Broadcasting Co.*, 957 F.2d 368, 370-71 (7th Cir. 1992) (citations omitted).

### A. The District Court improperly disregarded facts submitted by Ms. Bragg which show racial animus during the decision-making process, and establish grounds upon which a reasonable jury could find Community Hospital's stated reason for termination was pretext for discrimination on the basis of race.

Title VII bars employers from discriminating against employees because of their race, sex, color, religion, and/or national origin. 42 U.S.C. § 2000e, *et seq*. In actions brought for violations of Title VII "'the sole question that matters' is causation," i.e., did plaintiff's race cause his instant termination? *Joll v. Valparaiso Cmty. Sch.*, 953 F.3d 923, 929 (7th Cir. 2020) (citing *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 764–65 (7th Cir. 2016)).

The Seventh Circuit eliminated the distinction between the direct and indirect methods for analyzing summary judgment motions in *Ortiz v. Werner*, stating that "[t]he time has come to jettison these diversions and refocus analysis on the substantive legal issue." *Pearson v. Ill. Bell Tel. Co.*, 15 C 653, at *12 (N.D. Ill. Dec. 20, 2016) (citing *Ortiz v. Werner Enterprises, Inc.* at 764). But the burden-shifting method of proof described in

*McDonnell Douglas Corp. v. Green*, can still be a useful tool where "discriminatory animus is [] hard to come by." *Id.* (citing *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973)).

Under *McDonnell Douglas*, Ms. Bragg establishes a prima facie case of discrimination by showing 1) she is a member of a protected class, (2) she met defendant's legitimate expectations, (3) she suffered an adverse employment action, and (4) similarly situated employees who were not members of his protected class were treated more favorably. *Skiba v. Illinois Cent. R.R. Co.*, 884 F.3d 708, 719 (7th Cir. 2018)(citation omitted). Once Ms. Bragg makes this showing, the burden shifts to Defendant to state a legitimate non-discriminatory reason for Ms. Bragg's termination. *Kahn v. U.S. Secretary of Labor*, 64 F.3d 271, 278 (7th Cir. 1995). If this is accomplished, the burden returns to Ms. Bragg "to submit evidence that the employer's explanation is pretextual." *Andrews v. CBOCS W., Inc.*, 743 F.3d 230, 234 (7th Cir. 2014). In cases where a plaintiff asserts that the reasons for termination were the product of unlawful discrimination, the analysis of whether a plaintiff has stated the *prima facie* element of meeting expectations merges with plaintiff's requirement to show evidence that the stated reason was pretext for unlawful treatment. *Everroad v. Scott Truck Sys., Inc.,* 604 F.3d 471, 477–78 (7th Cir.2010).

In the case at bar, the district court granted summary judgment to Community Hospital as to Ms. Bragg's Title VII racial discrimination because in the court's view, "the brunt of the evidence—[Ms. Bragg's] progress reports and notes from weekly progress meetings—shows that [Ms. Bragg] consistently fell below Community Hospital's expectations." (Dkt. 50, p. 10). According to the district court, Ms. Bragg "provided little

more than her own suspicions that the reasons stated for her termination were not genuinely believed by [Community Hospital.]" (Id. at 13).

This is not true. Ms. Bragg produced more than "suspicions" of racial animus from which a reasonable jury could conclude Ms. Bragg was discriminated against on the basis of race in violation of Title VII, to the extent that it ultimately cost Ms. Bragg her job. Ms. Bragg's preceptors, Erin Wysocki, Brittany Arrigo, and Kim Raddatz openly demonstrated their racial animus towards Black people in Ms. Bragg's presence, and treated Ms. Bragg with corresponding disdain. Ms. Bragg presented the following evidence to the court in opposition to Community Hospital's motion for summary judgment, from which a reasonable jury could conclude Ms. Bragg was treated differently because of her race:

- Ms. Wysocki race-matched patients to herself and to Ms. Bragg, including removing a white patient from Ms. Bragg's care on her second day of employment;

- Mockery of black patients speech patterns by Ms. Arrigo and others, while at the nurse's station;

- Ms. Arrigo described an elderly Black woman's arm as a "skinny brown stick" to Ms. Bragg;

- Ms. Arrigo played sexually explicit rap music when Ms. Bragg arrived at the nurse's station;

- Ms. Wysocki screamed at Ms. Bragg, in front of patients and families on Ms. Bragg's first or second day on the floor, when an IV became detached from a patient;

- Sara Musson, a white registered nurse orientee who started at Community Hospital with Ms. Bragg, told Ms. Bragg that same day that an IV detaching was not an emergency, and that it had happened to one of Ms. Musson's patients and she did not get yelled at by her preceptor;

- The nurse from the IV team who came to replace that IV told Ms. Bragg that she did nothing wrong, but Ms. Wysocki put this incident in Ms. Bragg's evaluation nonetheless;

- Ms. Raddatz made a lynching joke to an elderly Black patient, while tending to that patient and noticing an oxygen cord accidentally around the patient's neck;

- Ms. Bragg was transferred to a lower-paying, lower-prestige facility where the nurses are overwhelmingly Black and/or people of color, unlike Community Hospital, where the nurses are mostly white.

The district court took note of the race-matching of patients in the first few days of Ms. Bragg's employment, but dismissed this fact because it involved just two patients in a five-day period. (Dkt. 50, p. 12). This result misunderstands the underlying facts. First, it was three (not two) patients in a five-day period, because a white patient was removed from Ms. Bragg's care. Second, Ms. Bragg reported this incident immediately to Dan Heredia, and was assigned a new preceptor, thereby cutting off the race-matching issue

(and likely putting everyone on notice) before this nonsense continued further. Third, Community Hospital flatly denies race-matching of patients occurred, (Dkt. 36-1, ¶¶ 96-97), despite the fact that Ms. Bragg brought the problem to Community Hospital's attention immediately.

As to the remaining racially derogatory remarks and actions, Community Hospital denies all of it. Ms. Wysocki denies ever yelling at Ms. Bragg in front of patients, and denies taking a white patient away from Ms. Bragg. (Dkt. 36-3, pp. 108-109, ¶26, 28-29). Ms. Arrigo denies mocking the speech patterns of Black patients, and does not recall referring to an elderly Black patient's arm as a "skinny brown stick," and denies knowledge of what is meant by "rap or hip-hop music." (Dkt. 36-3, pp. 116 , ¶¶34-38). Ms. Raddatz does not recall joking to an elderly Black patient about "let's not have a hanging tonight." (Dkt. 36-3, pp. 124, ¶36) All three preceptors deny Ms. Bragg's assertions that Ms. Bragg complained to them (individually) or expressed any disapproval about racially-derogatory remarks. (Dkt. 36-3, p. 107, ¶13, p. 113, ¶13, p. 121, ¶13). Ms. Raddatz denies Ms. Bragg ever accused Ms. Raddatz of falsifying information to get Ms. Bragg fired. Dkt. 36-3, pp. 124, ¶38).

Racially derogatory comments can establish actionable racial animus in the workplace if such comments are made by the decision-maker in close connection to the adverse employment decision. *Dandy v. United Parcel Service, Inc.,* 388 F.3d 263, 272 (7th Cir. 2004). According to Community Hospital procedure, the first ninety days of an RN's employment are spent training under a more experienced registered nurse, who then prepares biweekly written evaluations of the new nurse's job performance. (Dkt. 36-1, ¶¶

23-24, 26-27, 41). During Ms. Bragg's ninety days at Community Hospital, the only individuals who personally observed Ms. Bragg provide patient care were Ms. Wysocki, Ms. Arrigo, and Ms. Raddatz, i.e., none of Community Hospital's alleged decision-makers were ever in the room when Ms. Bragg performed her job duties. (Dkt. 43-1, ¶¶71-74).

This Court has held that "the point of a probationary period is to give employees a trial run. " *Hill v. Tangherlini*, 724 F.3d 965, 968 (7th Cir. 2013). A recent summary judgment decision in the Northern District of Illinois referred to a "probationary period as essentially a one-year-long interview." *Belcastro v. United Airlines, Inc.*, 17-cv-01682, at *17 (N.D. Ill. Mar. 28, 2022). Ms. Bragg was an orientee during her entire 90-day tenure at Community Hospital, during which a "preceptor will stay with the orientee a great majority of the time observing the orientee's performance." (Dkt. 36-1, ¶ 19). "Orientee progress forms are prepared by the orientee's preceptors." (Id. at ¶ 23). Ms. Wysocki, Ms. Arrigo, and Ms. Raddatz averred in their respective affidavits that each "report[s] to and confer[s] with Dan Heredia, RN, Educator, Samantha Kranz, RN, Nurse Manager, and Carla Meyer, RN, Director of Nursing, to advise them regarding an orientee's performance, progress, areas of concern and any incidents that warrant attention." (¶ 9 of all the affidavits). These facts taken together make it very difficult to separate all of the racial "stray remarks" from the decision-making process, given that Community Hospital's orientation program explicitly functions as a ninety-day job evaluation. How can it be said that racial animus by Ms. Bragg's preceptors, directed at

Ms. Bragg or at Black patients under Ms. Bragg's care, is *not* connected to the decision-making process, under these conditions?

Given the role that Community Hospital's preceptors play in evaluating and documenting an orientee's job performance, the district court's footnote dispensing with Ms. Bragg's cat's paw theory of liability is a mystery. (Dkt. 50, p. 8, fn 1). The only Community Hospital employees with direct knowledge of Ms. Bragg's patient care skills are Ms. Wysocki, Ms. Arrigo, and Ms. Raddatz.  Mr. Heredia or Ms. Kranz may have helmed meetings and kept meeting minutes, but Mr. Heredia and Ms. Kranz received all of their information about Ms. Bragg's day-to-day job performance from Ms. Bragg's preceptors.  (Dkt. 43-1, ¶¶71-74). Ms. Bragg has presented evidence that a reasonable jury could conclude demonstrates racial bias on behalf of Ms. Wysocki, Ms. Arrigo, and Ms. Raddatz. These three RNs are analogous to defendant Gregory Ernst in *Taylor v. Ways*. *Taylor v. Ways,* 999 F.3d 478, 489 (7th Cir. 2021). Ms. Wysocki, Ms. Arrigo, and Ms. Raddatz, all of whom who demonstrated racial bias at the time they were evaluating Ms. Bragg,  provided the information and the details which were designed to poison Ms. Bragg's employment relationship with Community Hospital.

This court has held that "if the ultimate decision-maker does determine whether the adverse action is entirely justified apart from the supervisor's recommendation, then the subordinate's purported bias might not subject the employer to liability." *Woods v. City of Berwyn*, 803 F.3d 865, 870 (7th Cir. 2015). There is no evidence of an independent investigation . Ms. Bragg's statement that *only* Ms. Wysocki, Ms. Arrigo, and Ms. Raddatz have personal knowledge of Ms. Bragg's job performance is unrebutted and

uncontested by Community Hospital. There are no allegations of patient complaints or any other facts unrelated to patient care, upon which Community Hospital based Ms. Bragg's termination. Therefore, a reasonable jury could find that the "the chain of causation" remains intact, and that the evaluations supplied verbally and in writing by Ms. Wysocki, Ms. Arrigo, and Ms. Raddatz, were the proximate cause of Ms. Bragg's termination. *Schandelmeier-Bartels v. Chicago Park Dist*, 634 F.3d 372, 383 (7th Cir. 2011).

The district court disregarded Ms. Bragg's many rebuttals in the record to the allegations that she managed time poorly, or had difficulty administering IVs—the district court's determination that Ms. Bragg *agreed* with the majority of the negative evaluations has no support in the record. That notwithstanding, Community Hospital's stated reason for Ms. Bragg's termination, i.e., that she could not perform the duties of an RN in an acute care setting, fails a significant sniff test. In *Peirick v. Indiana*, this Court found suspect the stated reasons for termination where the plaintiff was allegedly terminated for "unsafe or severe" behavior. *Peirick v. Indiana,* 510 F.3d 681 (7th Cir. 2007). The *Peirick* plaintiff was a college tennis coach who was fired for driving unsafely, leaving students behind on a trip, and using profanity and yelling to discipline her players. *Peirick v. Indiana,* at 692. At the time of the coach's termination, she was not told that her "foul language, poor driving, [and] inattentiveness to trailing vehicles" was the cause of her termination. *Id*. This Court reversed summary judgment for defendant because the "pattern of delay" caused the Court to question whether these very serious safety and behavior accusations were the true reason for termination. *Id.* at 693.

25

The case at bar presents a similar problem with Community Hospital's stated reason for termination. Community Hospital is part of the Munster Medical Research Foundation ("MMRF"), of which there are sister medical facilities, including Hartsfield Village, a long-term skilled nursing facility. Community Hospital terminated Ms. Bragg for alleged poor performance not by rendering Ms. Bragg unemployed, but instead, by *transferring* Ms. Bragg to Hartsfield Village. Community Hospital contends that this transfer was to provide Ms. Bragg with "a less demanding, slower pace" position, (Dkt. 36-1, ¶76), but there is a genuine issue of material fact as to whether the transfer was "slower pac[ed]." Ms. Bragg presented unrebutted, admissible evidence that her role at Hartsfield Village demanded the same skills and duties as Community Hospital, but for "three times the number of patients per RN than at [Community Hospital], significantly more patient care tasks…, and patients who were older and sicker than patients at [Community Hospital]." (Dkt. 43, ¶¶ 47-48; Dkt. 43-1, ¶¶75-80) (containing a detailed listing of the job duties and responsibilities of both positions)). In short, the Hartsfield Village transfer required the same nursing skills, for triple the number of patients per nurse. It was a tougher job than the Community Hospital position.

This brings us back to *Peirick v. Indiana.*  If this Court was perplexed by the *Peirick* defendant's silence and delay over a coach's unsafe driving and leaving students behind on a trip, this Court should be especially suspicious of a *hospital* continuing to employ an *RN* accused of the performance deficiencies Community Hospital alleges Ms. Bragg demonstrated. Was Community Hospital not concerned with patient care and safety at Hartsfield Village? Of course it was, which is why a reasonable jury could

absolutely find that Community Hospital was *not* worried about patient care at Hartsfield Village because Ms. Bragg was actually very good at her job.

*Peirick* is analogous another way. Community Hospital would like this Court to believe that it discussed Ms. Bragg's alleged performance issues with her throughout her employment and at the time of termination, Ms. Bragg submitted evidence from which a jury could conclude it did no such thing. Half of the alleged evaluations proffered by Community Hospital were unknown to Ms. Bragg until this litigation, thereby directly contradicting Community Hospital's contention that it discussed Ms. Bragg's job performance deficiencies with her on a daily basis. (Second Interrogatory responses, cited by Defendant). Also in contradiction to Community Hospital's assertions, Ms. Bragg avers that there was no discussion of her job performance at the time of her termination from Community Hospital. Ms. Bragg was told only that she was being transferred to Hartsfield Village, and that she was not wanted at Community Hospital. (Dkt. 43-1, ¶ 69). No one at Community Hospital told Ms. Bragg *why* she was being transferred, or *why* she was no longer welcome at Community Hospital—that information did not come out until Ms. Bragg brought the instant action. (Dkt. 43-2, p. 3). In *Peirick*, this Court found evidence of pretext where the employer never mentioned allegedly serious concerns to plaintiff before or at the time of termination. *Peirick* at 692. So too should be the result in the case at bar.

"Pretext 'means a dishonest explanation, a lie rather than an oddity or an error.'" *Hague v. Thompson Distribution Co.*, 436 F.3d 816, 823 (7th Cir. 2006) (quoting *Kulumani v. Blue Cross Blue Shield Ass'n,* 224 F.3d 681, 685 (7th Cir. 2000). A reasonable jury could

surely determine that Community Hospital's stated reason for termination was dishonest, because transferring Ms. Bragg to Hartsfield Village would be dangerous for patients if Ms. Bragg's job performance was as poor as Community Hospital contends.

**B.   The District Court Erred in Granting Summary Judgment on Ms. Bragg's Title VII Retaliation Claim, Where Material Facts Remain in Dispute and All Inferences Were Drawn In Defendant's Favor**

To state a case of retaliation for protected activity under Title VII, Ms. Bragg must show: 1) she engaged in protected activity; 2) she suffered an adverse employment action, and 3) the protected activity was the cause of the adverse employment action. *Lewis v. Wilkie*, 909 F.3d 858, 866 (7th Cir. 2018). The primary inquiry at the summary judgment stage is "does the record contain sufficient evidence to permit a reasonable fact finder to conclude that retaliatory motive caused the discharge?" *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 563 (7th Cir. 2016) (citing *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. Aug. 19, 2016). "A causal link requires more than the mere fact that an employer's action happens after an employee's protected activity." *Boss v. Castro*, 816 F.3d 910, 918 (7th Cir. 2016) (citing Silverman v. Board of Educ. of City of Chicago, 637 F.3d 729, 741 (7th Cir. 2011)).

The district court granted summary judgment on Ms. Bragg's retaliation claim, holding "no reasonable jury could find that Bragg's negative evaluations were precipitated by a desire to retaliate for Bragg's complaint that she was assigned to only minority patients." (Dkt. 50, p. 15). Further, the court found that Ms. Bragg "[did] not contest the majority of the critiques in her performance evaluations." (Id.). The district court has erred on both points.

First, it is not clear why the district court believes no jury could find that Ms. Bragg's negative evaluations were caused by a "desire to retaliate." (Id.). Ms. Bragg was two days on the job when she commented to Ms. Wysocki that she "was capable of taking care of patients of all races." This was triggered by Ms. Bragg noticing on her first day that she and Ms. Wysocki were race-matched to their patients. When Ms. Bragg pointed this out, it took barely a day for Ms. Wysocki explode at Ms. Bragg, humiliating her in front of the patient and the patient's family, blaming Ms. Bragg for an IV that had become detached from a patient. (Dkt. 43, ¶¶9-10).

Ms. Bragg  contested falsehoods Ms. Arrigo put into evaluations. (Dkt. 43, ¶¶19-22). Ms. Bragg's evaluations for October 22 and November 1, 2018—before Ms. Raddatz became her preceptor—showed Ms. Bragg was able to consistently handle four patients. (Dkt. 43, ¶26). When Ms. Raddatz became her preceptor, Ms. Raddatz began doing things to distract Ms. Bragg or make her life difficult. (Dkt. 43, ¶25). At the end of November 2018, Mr. Heredia told Ms. Bragg that she needed to be 100% accurate, despite no evidence of perfect scores in the evaluations proffered by Community Hospital for Shavon Henderson, a Black RN with no history of making race discrimination complaints. (Dkt. 43, ¶31; Dkt. 36-3, pp. 156-166). Ms. Raddatz told Ms. Bragg that Ms. Raddatz took a lot of notes about Ms. Bragg's performance for "legal records." (Dkt. 43, ¶30). Ms. Bragg went to Ms. Kranz several times over Ms. Raddatz's false documentation of errors, which included Ms. Raddatz blaming Ms. Bragg for a medication error that Ms. Bragg *caught* when Ms. Raddatz did not. (Dkt. 43, ¶¶32-33). Ultimately, Ms. Bragg's employment at Community Hospital did not survive her

orientation period, and Community Hospital terminated Ms. Bragg's employment entirely based on the content of her performance evaluations.

"Unfair reprimands or negative performance reviews, unaccompanied by tangible job consequences, do not constitute adverse employment actions." *Jones v. Res-Care, Inc.*, 613 F.3d 665, 671 (7th Cir. 2010) (quoting *Grube v. Lau Industries, Inc.*, 257 F.3d 723, 729 (7th Cir. 2001)). In the present case, Ms. Bragg did indeed suffer a tangible job consequence by being transferred to a lower paying, less prestigious, yet somehow more demanding RN position at Hartsfield Village. A reasonable jury could conclude that the die was cast just a few days into Ms. Bragg's employment, when Ms. Bragg confronted Ms. Wysocki about race-matching patient assignments. Further, a reasonable jury could conclude that everything that flowed from that day until Ms. Bragg's termination was designed to "dissuade a reasonable worker from making or supporting [engaging in protected activity." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006).

A jury is likely to be persuaded by the fact that Ms. Bragg is just one of two RNs to be terminated at the end of Community Hospital's RN orientation program in the last five years. The other RN, Ms. Anderson, is a white comparator who received lower marks than Ms. Bragg, actually argued with her preceptors when they tried to instruct her, something Ms. Bragg never did.  Comparing Ms. Bragg's job performance to that of Mary Anderson, a white RN orientee fired by Defendant, we see Ms. Anderson received higher scores for more profound job performance deficiencies (i.e., argued with preceptors when coached, and showed no effort to improve) than Ms. Bragg is accused of. (Dkt. 43,

30

¶44-45). Another comparator, Shavon Henderson, an African America RN precepted by Ms. Raddatz who did not engage in protected activity under Title VII like Ms. Bragg, got glowing evaluations from Ms. Raddatz.

In *Gracia v. SigmaTron, Int'l,* the court found it compelling that "the person who brought [plaintiff's] supposed infraction to [decision-maker's] attention was none other than the manager [plaintiff] had accused of sexual harassment only weeks earlier." *Gracia v. SigmaTron Int'l, Inc.,* 842 F.3d 1010 (7th Cir. 2016). Per the "cat's paw theory" discussed above, Defendant is liable for damages because Ms. Bragg's preceptors manipulated Defendant into terminating Ms. Bragg's employment. Community Hospital asserts that "The most significant part of an orientee's [] progress and the evaluation of such progress is towards the end of the 90 day orientation period when it must be determined whether the orientee has successfully completed orientation." (Dkt. 36-1, ¶24). Ms. Raddatz, with her constant note-taking and creation of "legal documents" was put in charge of Ms. Bragg's orientation for the end, and specifically tasked with taking copious notes in order to address any concerns. (Dkt. 36-3, p. 41 ("Kim [Raddatz] is going to observe and take notes each day so that issues can be addressed each day in post conference.") This arrangement set Ms. Bragg up to fail, all because Ms. Bragg dared to call nonsense on potentially discriminatory practices during her first week at Community Hospital.

## CONCLUSION

For the foregoing reasons, Plaintiff-Appellant respectfully requests the Court reverse the district court's judgment and remand this case for further proceedings on Appellant's claims of discrimination and retaliation against Community Hospital.

Respectfully submitted,

Plaintiff-Appellant,

Catrina Bragg,

By: _/s/_      _Lisa M. Stauff_____

Lisa M. Stauff
Law Offices of Lisa M. Stauff
53 W. Jackson Blvd., Suite 624
Chicago, Illinois 60604
(312) 212-1036
LMStauffLaw@gmail.com

**PROOF OF SERVICE**

The undersigned, counsel of record for the Plaintiff-Appellant, hereby certifies that on April 8, 2022, I electronically filed the foregoing Brief of Plaintiff-Appellant, Catrina Bragg, with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF System. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF System.

Dated: April 8, 2022

*/s/ Lisa M. Stauff*
Counsel of Record for Plaintiff-Appellant

**CERTIFICATE OF COMPLIANCE WITH FRAP RULE 32(a)(7),**

**FRAP RULE 32(g) and CR 32(c)**

The undersigned, counsel of record for the Plaintiff-Appellant, furnishes the

following in compliance with F.R.A.P. Rule 32(a)(7):

I hereby certify that this brief conforms to the rules contained in F.R.A.P. Rule

32(a)(7) for a brief produced with Book Antiqua 12-point font.

/s/ Lisa M. Stauff
Counsel of Record for Plaintiff-Appellant

Dated: April 8, 2022

**CIRCUIT RULE 30(d) STATEMENT**

Pursuant to Circuit Rule 30(d), counsel for Plaintiff-Appellant certifies that all material required by Circuit Rule 30(a) and (b) are included in the Appendix.

/s/ Lisa M. Stauff
Counsel of Record for Plaintiff-Appellant

Dated: April 8, 2022

# REQUIRED SHORT APPENDIX

## TABLE OF CONTENTS

Opinion and Order, *Catrina Bragg v. Munster Medical Research Fdn, Inc., d/b/a Community Hospital*
      No. 2:19-cv-00209-JTM-JPK, (N.D. Ind., September 17, 2021)
      (Dkt. No. 50)

Judgment, *Catrina Bragg v. Munster Medical Research Fdn, Inc., d/b/a Community Hospital*
      No. 2:19-cv-00209-JTM-JPK, (N.D. Ind., September 17, 2021)
      (Dkt. No. 51)

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

CATRINA BRAGG,                          )
                                        )
                    Plaintiff,          )
                                        )
        v.                              )        No. 2:19 CV 209
                                        )
MUNSTER MEDICAL RESEARCH                )
FOUNDATION INC.,                        )
                                        )
                    Defendant.          )

OPINION and ORDER

This matter is before the court on defendant's motion for summary judgment. (DE # 34.) For the reasons that follow, defendant's motion will be granted.

I.      BACKGROUND[1]

Plaintiff Catrina Bragg, an African American Registered Nurse, commenced employment with defendant Munster Medical Research Foundation d/b/a Community Hospital ("Community Hospital"), on September 10, 2018, and was separated from defendant's employment on December 12, 2018. (DE # 36-3 at 91.) Bragg filed the present suit following her termination, alleging discrimination on the basis of race and retaliation for engaging in a protected activity, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* (DE # 1 at 1.)

Bragg was a newly-licensed nurse with no prior healthcare experience when she began at Community Hospital. (DE # 36-3 at 91.) As a condition of her employment,

_____

[1] The following facts are undisputed or, where disputed, are taken in the light most favorable to plaintiff.

Bragg had to successfully complete a 90-day orientation. (*Id.* at 90.) At Community Hospital, experienced nurses serve as an orientee's preceptor, and provide guidance, direction, and instruction to the orientees. (*Id.* at 90-91.) As part of orientation, preceptors prepare progress forms evaluating and scoring the progress of orientees. (*See* DE # 36-3 at 24-31.)

During her orientation, Bragg had three preceptors: Erin Wysocki, Brittany Arrigo, and Kim Raddatz. (*Id.* at 91.) Her first preceptor was Wysocki. (DE # 43-1 at 1.) Bragg's preceptors chose which patients to assign her. (*Id.*) During Bragg's first five days seeing patients she noticed that the two patients assigned to her were of minority races, whereas the patients assigned to Wysocki were white. (DE # 43-1 at 2; DE # 36-2 at 101-103.) When Bragg was assigned to a white patient, Wysocki removed that patient from Bragg's care without explanation. (DE # 43-1 at 2.) Bragg told Wysocki that she was capable of caring for patients of all races. (*Id.*) Within a day of this incident, Wysocki became irate and shouted at Bragg after an IV became disconnected from a patient. (*Id.*) Bragg informed Dan Heredia, an educator for Community Hospital, about Wysocki's reaction to the IV incident and about Wysocki only assigning her minority patients. (*Id.* at 4.) Samantha Kranz, the Nurse Manager, assigned Bragg a new preceptor, Brittany Arrigo. (*Id.*) Under Arrigo's preceptorship, Bragg was no longer exclusively assigned to patients of minority races. (DE # 36-2 at 102.)

While Arrigo was her preceptor, Bragg heard Arrigo say that an African American patient "had an amputated arm, but she's so cute, it looks like a stick"

2

because the patient's arm was "skinny and brown." (DE # 43-1 at 4; DE # 36-3 at 74.) Bragg told Arrigo that her statement was not funny and Arrigo stopped laughing. (DE # 43-1 at 4.) There were also several occasions on which Arrigo changed the music playing from Britney Spears or country music, to rap or hip-hop, when Bragg came up to the nurse's station. (DE # 36-3 at 57.) Bragg claims that she expressed her disdain for this practice by frowning when it happened. (*Id.*)

Bragg's third and final preceptor was Kim Raddatz. (DE # 43-1 at 5.) According to Bragg, Raddatz took copious notes of Bragg's performance, telling Bragg that she was creating "legal records." (*Id.*) Bragg told Raddatz that she knew Raddatz was trying to get her fired. (*Id.* at 6.)

According to Bragg, she prevented a medication error after she discovered a computer-generated calculation error, but Raddatz later reported on her progress report that she had committed a medication error. (*Id.* at 6.) Bragg told Kranz that Raddatz was lying about her performance, but Kranz did not believe her and screamed at her. (*Id.* at 7.)

Bragg also claims that Raddatz would do disruptive things to distract or intimidate her, such as standing very close when Bragg was tending to a patient, or clapping her hands or stomping her feet. (DE # 36-3 at 61-62.) She would also "disappear" when it was time for Bragg to administer medicine – something Bragg was not authorized to do on her own – and later Raddatz would counsel Bragg on time management. (*Id.*)

3

On the day her employment was terminated, Bragg observed an incident in which an IV tube became caught around the neck of an African American patient and Raddatz stated, "whoops, let's not having a hanging tonight!" (*Id.* at 61.) Bragg claims that she replied, disgustedly, "I can't believe what I just heard." (*Id.*)

During the course of her orientation, Bragg's preceptors submitted written evaluations and held meetings to discuss Bragg's progress and performance. (*See id.* at 24-48.) On October 1, 2018, Wysocki submitted an evaluation scoring Bragg's performance 12 out of a possible 25 points, and noting that Bragg should improve her comfort with IVs, should begin giving reports to the oncoming nurse, and should improve her organization with the report sheet. (*Id.* at 24.) At the bi-weekly progress meeting, Wysocki noted that Bragg needed to work on time management, and needed to work on managing IV tubing, and primary and secondary infusions. (*Id.* at 33.)

On October 22, 2018, Arrigo scored Bragg's performance 14 out of 25, and noted that Bragg should utilize a to-do list so that no medications and dressing changes get forgotten, and she should become more comfortable with IVs and begin to develop more autonomy, requiring less prompting with patient care. (*Id.* at 26.) During the bi-weekly progress meeting, it was noted that Bragg should continue to try to improve time-management and medication administration. (*Id.* at 35.)

On November 1, 2018, during the bi-weekly progress meeting, Bragg, Arrigo, Kranz, and Heredia acknowledged that Bragg had not completed tasks typical for that point in her orientation. (*Id.* at 37.) They also discussed concerns with Bragg's comfort

4

with military time, recognizing critical potassium levels with appropriate interventions, IV Lasix administration standards, and comfort with insulin administration. (*Id.*) Everyone agreed that Bragg should have weekly, as opposed to bi-weekly, evaluations going forward, to ensure that goals are clear and being met. (*Id.*)

On November 9, 2018, during her weekly meeting, it was noted that Bragg's performance and progress was below expectation for that stage of orientation, and there were concerns about her application of knowledge and patient safety, including a medication error where a patient was given the wrong dose of medication. (*Id.* at 39.) Additionally, Arrigo reported that Bragg told a patient that the drug Toradol was addictive, and that Bragg later incorrectly said that Toradol was an antihistamine. (DE # 36-2 at 45; DE # 36-3 at 39.) Bragg claims that she was merely restating what the patient said. (DE # 36-2 at 45.) Arrigo also reported that Bragg had a problem understanding the appropriate dosages for Fentanyl. (DE # 36-3 at 39.) Bragg disputes that she made this mistake. (DE # 43-1 at 5.)

On November 15, 2018, during her weekly progress meeting, it was noted that Bragg was unable to identify what the caution symbol on the IV pump meant, and failed to realize that the flush bag on an IV pump had expired. (*Id.* at 41.)

 On November 26, 2018, Raddatz scored Bragg's performance 12 out of 25, and noted that Bragg should do more admissions, discharges, patient teaching, learn doctors' names, and communicate correct information. (*Id.* at 28.) Raddatz expressed concern that Bragg was not ready to end orientation, and that Bragg required

substantially more orientation. She noted that while Bragg had made many improvements, she needed to develop her critical thinking skills to anticipate patient needs, without so much prompting. (*Id.* at 29.) At a progress meeting the same day, it was noted that Bragg's evaluation scores were low for what would be expected at that point in Bragg's orientation, and that significant improvements must be made prior to the next meeting. (*Id.* at 44.)

On December 9, 2018, Raddatz scored Bragg's performance 12 out of 25, and noted that while there had been slight growth, she still forgot to do tasks without prompting. (*Id.* at 31.) A score of 12 out of 25 is considered an extremely low score for that stage in orientation. (*Id.* at 129.)

On December 12, 2018, Kranz and Carla Meyer, the Director of Nursing, terminated Bragg's employment with Community Hospital. (DE # 43-1 at 8.) According to Kranz and Meyer, based on the information they received from Bragg's preceptors and their own personal observations, Bragg failed to progress through her orientation and her performance remained deficient. (*Id.* at 131-132, 140-141.) Kranz and Meyer found that Bragg was very slow to learn proper procedures, had difficulty serving multiple patients, and demonstrated poor time management and poor critical thinking skills. (*Id.*) Thus, they determined that Bragg should not move forward as a staff member in the unit. (*Id.*) Bragg was told that she would be transferred to a skilled nursing facility. (*Id.*) The job to which she was transferred was a less desirable position and paid less. (*Id.*; DE # 43-3 at 3.)

Community Hospital now moves for summary judgment on both of Bragg's claims. (DE # 34.) This matter is fully briefed and is ripe for ruling.

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 56 requires the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In responding to a motion for summary judgment, the non-moving party must identify specific facts establishing that there is a genuine issue of fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); *Palmer v. Marion County*, 327 F.3d 588, 595 (7th Cir. 2003). In doing so, the non-moving party cannot rest on the pleadings alone, but must present fresh proof in support of its position. *Anderson*, 477 U.S. at 248; *Donovan v. City of Milwaukee*, 17 F.3d 944, 947 (7th Cir. 1994). A dispute about a material fact is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If no reasonable jury could find for the non-moving party, then there is no "genuine" dispute. *Scott v. Harris*, 550 U.S. 372, 380 (2007).

The court's role in deciding a summary judgment motion is not to evaluate the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. *Anderson*, 477 U.S. at 249-50. In viewing the facts presented on a motion for summary judgment, a court must construe all facts in a light most favorable to the

7

non-moving party and draw all legitimate inferences and resolve all doubts in favor of that party. *NLFC, Inc. v. Devcom Mid-Am., Inc.*, 45 F.3d 231, 234 (7th Cir. 1995).

## III.    ANALYSIS

### A.    Race Discrimination

At the summary judgment phase in a Title VII action, the court must determine whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race (or other proscribed factor) caused an adverse employment action.[2] *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016); *David v. Bd. of Trustees of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017). The burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), may assist a plaintiff in convincing a court that the evidence permits such a conclusion. *David*, 846 F.3d at 224. This framework may be useful as "a means of organizing,

---

[2] Typically, a plaintiff must establish discriminatory intent on the part of the decision-maker. However, in this case, Bragg is proceeding on a cat's paw theory. (DE # 42 at 11.) "This theory applies when a biased supervisor who lacks decisionmaking power uses the formal decision maker as a dupe in a deliberate scheme to trigger a discriminatory employment action." *Vesey v. Envoy Air, Inc.*, 999 F.3d 456, 461 (7th Cir. 2021) (internal citation and quotation marks omitted). To establish race discrimination under a cat's paw theory, "the plaintiff must present evidence that the biased subordinate actually harbored discriminatory animus against him and that the subordinate's scheme proximately caused the adverse employment action." *Sinha v. Bradley Univ.*, 995 F.3d 568, 574 (7th Cir. 2021) (internal citation and quotation marks omitted). Here, Bragg argues that Wysocki, Arrigo, and Raddatz used their progress reports to Kranz and Meyer to dupe Kranz and Meyer into terminating Bragg's employment. As discussed more fully in this section, Bragg cannot prevail on her discrimination claim – even under a cat's paw theory – because she has failed to identify sufficient evidence of discriminatory animus, either on the part of Wysocki, Arrigo, and Raddatz, or on the part of Kranz and Meyer. Moreover, she has failed to establish that her preceptors' scheme proximately caused her termination.

presenting, and assessing circumstantial evidence in frequently recurring factual patterns found in discrimination cases." *Id.* However, the *McDonnell Douglas* analysis is "not the only way to assess circumstantial evidence of discrimination." *Id.* The court must ultimately be guided by the test articulated in *Oritz*, and determine whether "the non-moving party produced sufficient evidence to support a jury verdict of intentional discrimination[.]" *Id; see also Abrego v. Wilkie*, 907 F.3d 1004, 1012 (7th Cir. 2018).

In this case, Bragg has organized her argument based on the *McDonnell Douglas* framework, and therefore the court will begin assessing the evidence utilizing that construct. To establish a prima facie case under *McDonnell Douglas*, Bragg must demonstrate that: (1) she is a member of a protected class; (2) she was qualified for her position and performed reasonably on the job in accordance with her employer's legitimate expectations; (3) she was subject to an adverse employment action despite her reasonable performance; and (4) similarly situated employees who were not members of her protected class were treated more favorably. *Oliver v. Joint Logistics Managers, Inc.*, 893 F.3d 408, 412 (7th Cir. 2018); *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 894–95 (7th Cir. 2018). "An employee is similarly situated to a plaintiff if the two employees deal with the same supervisor, are subject to the same standards, and have engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Fane v. Locke Reynolds, LLP*, 480 F.3d 534, 540 (7th Cir. 2007).

If there is sufficient evidence from which a jury could find a prima facie case of discrimination, the burden shifts to Community Hospital to produce evidence of a legitimate, nondiscriminatory reason for terminating Bragg's employment. *See Barnes v. Bd. of Trustees of Univ. of Illinois*, 946 F.3d 384, 389 (7th Cir. 2020). If Community Hospital produces such a reason, the burden shifts back to Bragg, to produce evidence that defendant's proffered reason was pretextual. *See id.* Pretext "is not just faulty reasoning or mistaken judgment on the part of the employer; it is a lie, specifically a phony reason for some action." *Id.* (cleaned up). "Because the prima facie and pretext inquiry often overlap, if a defendant offers a nondiscriminatory reason for its actions, we can proceed directly to the pretext inquiry." *Id.* The court will do so here.

Community Hospital put forth a legitimate, nondiscriminatory reason for terminating Bragg's employment: Bragg failed to make sufficient progress during her orientation period to be qualified for a permanent position. (DE # 36-3 at 92, 129.) Even without considering the few incidents in her progress reports that Bragg disputes, Community Hospital has put forth robust evidence that Bragg was not meeting the legitimate expectations of her employer. The brunt of the evidence – her progress reports and notes from weekly progress meetings – shows that Bragg's performance consistently fell below Community Hospital's expectations. *See Igasaki v. Illinois Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 958 (7th Cir. 2021). Her preceptors, Educator Heredia, Kranz, and Meyer continuously expressed concerns regarding Bragg's lack of progress, poor time management, lack of knowledge, and mistakes.

10

Bragg's race discrimination claim fails under the *McDonell Douglas* framework because she has not established that the reasons provided by Community Hospital were mere pretext for discrimination. Bragg has not raised a genuine dispute of material fact concerning her failure to meet Community Hospital's legitimate expectations. The question is not whether Community Hospital's reasons for terminating Bragg's employment were right – the question is whether those reasons were honest. *See Igasaki*, 988 F.3d at 958.

Bragg points to specific acts or comments by Wysocki, Arrigo, and Raddatz as evidence of dishonesty. (DE # 42 at 11.) Yet, this evidence falls short of creating a question of fact regarding racial animus. Bragg's evidence that Arrigo played explicit rap music when she was at the nurse's station and stated that an African American's arm looked like a stick, is insufficient to create an inference of racial animus directed toward Bragg. The same is true of Raddatz's comment, "let's not have a hanging tonight," when an IV tube became wrapped around an African American patient's neck. These statements may be racially insensitive or even offensive, but they are not sufficient to demonstrate that Arrigo and Raddatz acted with discriminatory intent in evaluating Bragg's performance. "Remarks can raise an inference of discrimination when they are (1) made by the decision-maker, (2) around the time of the decision, and (3) in reference to the adverse employment action. When considering whether a remark is discriminatory, we also consider the context in which the remark was made." *Bagwe v. Sedgwick Claims Mgmt. Servs., Inc.*, 811 F.3d 866, 885 (7th Cir. 2016) (internal citation

and quotation marks omitted); *see also Perez v. Thorntons, Inc.*, 731 F.3d 699, 709 (7th Cir. 2013) ("Standing alone, biased comments do not establish discriminatory motive unless they were by the decision maker and can be connected to the decision."). Here, Arrigo and Raddatz's remarks cannot be connected to the adverse employment action – the remarks were not made in reference to Bragg. Neither of these comments would allow a juror to reasonably infer discriminatory intent.

Bragg's claim that Wysocki race-matched her to patients presents a marginally more compelling case for an inference of racial animus. However, the fact that during a five-day period Bragg's two patients were of minority races, while her preceptor's patients were white, is simply not sufficient, in the face of Bragg's performance reviews and the undisputed problems in her performance, to raise a question of fact regarding pretext or the ultimate question of discriminatory intent.

Bragg argues that inaccuracies in Arrigo and Raddatz's reports are evidence of pretext. (DE # 42 at 11.) She also claims that she was held to unreasonably stringent standards on account of her race, and this is further evidence of pretext. Yet, the evidence does not support an inference that Arrigo and Raddatz's reports or low progress scores were motivated by Bragg's race. Harsh, unfair, or inappropriate acts alone are not sufficient to proceed to trial on a discrimination claim. *See e.g. Igasaki*, 988 F.3d at 958. Here, there is no evidence supporting a reasonable inference that the preceptors' treatment of Bragg was linked to Bragg's race. Relatedly, there is no evidence that her preceptors' alleged racial animus proximately caused Bragg's

12

termination. Bragg has provided little more than her own suspicions that the reasons stated for her termination were not genuinely believed by defendant's employees, and instead were part of a scheme to dupe Meyer and Kranz into firing her. Bragg's own suspicions are not good enough to survive summary judgment. *See Uhl v. Zalk Josephs Fabricators, Inc.,* 121 F.3d 1133, 1137 (7th Cir. 1997) ("Facts, not an employee's perceptions and feelings, are required to support a discrimination claim.").

Even if this court sets aside the *McDonnell Douglas* paradigm, and assesses the evidence holistically, it is clear that a reasonable jury could not conclude that Bragg's discharge from Community Hospital was motivated by her race. Accordingly, defendant is entitled to summary judgment on this claim.

B.    *Retaliation*

Next, the court considers Bragg's retaliation claim. Title VII forbids employers from retaliating against employees for engaging in statutorily protected activities by opposing an unlawful employment practice or participating in the investigation of one. 42 U.S.C. § 2000e-3(a); *Swyear v. Fare Foods Corp.*, 911 F.3d 874, 885 (7th Cir. 2018). There are two ways a plaintiff may prove a prima facie retaliation claim. *Lewis v. Wilkie*, 909 F.3d 858, 866 (7th Cir. 2018). "A plaintiff opting for the 'direct' method must present evidence that (1) she engaged in a protected activity, (2) she suffered an adverse action, and (3) a causal connection exists between the two." *Swyear*, 911 F.3d at 885. "For the first element—a statutorily protected activity—[t]he plaintiff must not only have a subjective (sincere, good faith) belief that he opposed an unlawful practice; his belief

13

must also be objectively reasonable, which means that the complaint must involve discrimination that is prohibited by Title VII." *Logan v. City of Chicago*, 4 F.4th 529, 538 (7th Cir. 2021) (internal citation and quotation marks omitted).

Alternatively, a plaintiff may choose the "indirect method." *Id.* This method "allows the plaintiff to establish a prima facie case without establishing a causal link." *Id.* "This method requires a plaintiff show (1) she engaged in a protected activity, (2) she performed her job duties according to her employer's legitimate expectations, (3) she suffered an adverse action, and (4) she was treated less favorably than similarly situated employees who did not engage in the protected activity." *Id.* "The indirect method falls under the auspices of the *McDonnell Douglas* burden-shifting framework discussed above.

Regardless of which method a plaintiff chooses, the court must ultimately consider the evidence as a whole to determine whether the evidence would permit a reasonable factfinder to conclude that retaliatory motive caused the discharge or other adverse employment action.[3] *Igasaki*, 988 F.3d at 959.

In this case, Bragg has opted for the direct method. Bragg claims that she engaged in the following protected activity: she complained about Wysocki assigning her patients on the basis of race; she expressed non-verbal disapproval of Arrigo's comment about a patient's arm and about Arrigo playing rap music in her presence;

---

[3] A cat's paw theory of liability may also apply to a retaliation claim. *Miller v. Polaris Lab'ys, LLC*, 797 F.3d 486, 492 (7th Cir. 2015). As with her discrimination claim, Bragg asserts such a theory with regard to her retaliation claim.

14

and she spoke out disapprovingly when Raddatz made a lynching joke. (DE # 42 at 13.) She argues that as a result of her protected activity, she received negative performance evaluations and was terminated. (*Id.*) Bragg argues, "[a] reasonable jury could find Ms. Bragg's preceptors made it their life's work to get Ms. Bragg fired when she called out Ms. Wysocki for assigning Ms. Bragg only minority patients." (*Id.* at 14.) This court disagrees. No reasonable jury could find that Bragg's negative evaluations were precipitated by a desire to retaliate for Bragg's complaint that she was assigned to only minority patients – not when Bragg herself does not contest the majority of the critiques in her performance evaluations. Bragg has failed to establish any causal connection between her complaints and her termination.

Bragg's retaliation claim also fails when this court considers the evidence as a whole under the *Ortiz* standard. Bragg's retaliation claim rests solely on speculation. No reasonable jury could conclude that a retaliatory motive caused Bragg's termination. Accordingly, defendant is entitled to summary judgment on this claim.

## IV.    CONCLUSION

Defendant's motion for summary judgment (DE # 34) is **GRANTED.** The court directs the Clerk to **ENTER FINAL JUDGMENT** stating:

> Judgment is entered in favor of defendant Munster Medical Research Foundation Inc *doing business as* Community Hospital, and against plaintiff Catrina Bragg, who shall take nothing by way of the complaint.

**SO ORDERED.**

Date: September 17, 2021

s/James T. Moody
JUDGE JAMES T. MOODY
UNITED STATES DISTRICT COURT

15

AO 450 (Rev. 01/09) Judgment in a Civil Action

# UNITED STATES DISTRICT COURT

for the
Northern District of Indiana

CATRINA BRAGG,

               Plaintiff,

v.                                       Civil Action No.  2:19-cv-00209

MUNSTER MEDICAL RESEARCH FOUNDATION INC.,
doing business as Community Hospital,

               Defendant

## JUDGMENT IN A CIVIL ACTION

The court has ordered that (*check one*):

___  the plaintiff _____
recover  from  the  defendant_____the amount of
dollars $_____, which includes prejudgment interest at the rate of_____% plus post-judgment
interest at the rate of_____% along with costs.

____  the plaintiff recover nothing, the action is dismissed on the merits, and the defendant
recover costs from the plaintiff_____.

 _X_  Other: Judgment ENTERED in favor of defendant Munster Medical Research Foundation Inc doing
business as Community Hospital, and against plaintiff Catrina Bragg, who shall take nothing by way of
the complaint.

This action was (*check one*):

___ tried to a jury with Judge_____presiding, and the jury has
rendered a verdict.

___ tried by Judge_____without a jury and the above decision was
reached.

 _X_ decided by Judge James T. Moody on a Motion for Summary Judgment by Defendant.

DATE:  September 17, 2021              GARY T. BELL, CLERK OF COURT

                                     By: s/ L. Higgins-Conrad
                                      *Signature of Deputy Clerk*