**No. 21-2913**

---

**UNITED STATES COURT OF APPEALS**

**FOR THE SEVENTH CIRCUIT**

_____

**CATRINA BRAGG**

**Plaintiff-Appellant,**

**v.**

**MUNSTER MEDICAL RESEARCH FOUNDATION, INC.
D/B/A COMMUNITY HOSPITAL**

**Defendant-Appellee**

_____

**Appeal from the United States District Court for the Northern District
of Indiana, Hammond Division, No. 2:19-CV-00209-JTM
Honorable Judge James T. Moody**

_____

**BRIEF OF DEFENDANT - APPELLEE**

_____

James E. Daugherty, Esq.
Indiana Bar No. 4398-45
Law Offices of James E. Daugherty
8029 Cleveland Place
Merrillville, IN 46410
Telephone:  (219) 769-5500
Facsimile: (219) 769-5501
E-Mail:  jdaughertylaw@aol.com
Counsel of Record for Defendant-Appellee

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: __21-2913__

Short Caption: __Catrina Bragg v. Munster Medical Research Foundation Inc. d/b/a Community Hospital__

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)   The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
   __Munster Medical Research Foundation Inc. d/b/a Community Hospital__

(2)   The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
   __N/A__

(3)   If the party, amicus or intervenor is a corporation:

   i)   Identify all its parent corporations, if any; and

      __Community Foundation of Northwest Indiana, Inc. (in part)__

   ii)   list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

      __N/A__

(4)   Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

   __N/A__

(5)   Provide Debtor information required by FRAP 26.1 (c) 1 & 2;

   __N/A__

Attorney's Signature: __/s/ James E. Daugherty__     Date: __October 26, 2021__

Attorney's Printed Name: __James E. Daugherty__

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).  Yes ☑  No ☐

Address: __Law Offices of James E. Daugherty, 8029 Cleveland Place, Merrillville, IN  46410__

Phone Number: __219-769-5500__     Fax Number: __219-769-5501__

E-Mail Address: __jdaughertylaw@aol.com__

rev. 12/19 AK

# TABLE OF CONTENTS

APPEARANCE AND CIR. RULE 26.1 DISCLOSURE STATEMENT .................................. i

TABLE OF CONTENTS ........................................................................... ii

TABLE OF AUTHORITIES .................................................................iii-vi

JURISDICTIONAL STATEMENT ...................................................................1

STATEMENT OF THE ISSUES ...................................................................1

STATEMENT OF THE CASE ...................................................................2

   I.   Statement of Facts ...................................................................2

   II.  Proceedings in the District Court ...................................................16

SUMMARY OF ARGUMENT ...................................................................16

STANDARD OF REVIEW ...................................................................17

ARGUMENT ...................................................................18

   A.   Bragg's deposition testimony ...................................................18

   B.   Bragg's allegations of racial discrimination ...................................18

   C.   Bragg's allegation of retaliation ...................................................22

   D.   Bragg's unsuccessful attempt to apply the cat's paw theory of liability ...................26

CONCLUSION ...................................................................28

CERTIFICATE OF COMPLIANCE WITH FRAP RULE 32(a)(7),
   FRAP RULE 32(g) AND CR 32(c) ...................................................29

PROOF OF SERVICE ...................................................................30

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242, 248, 252 (1986) ............................................................17

*Argyropoulos v. City of Alton,*
539 F.3d 724, 736 (7th Cir. 2008) .......................................................21

*Barnes v. Bd. of Trustees of Univ. of Illinois,*
946 F.3d 384, 389-390 (7th Cir. 2020)................................................21

*Boss v. Castro,*
816 F.3d 910, 917 (7th Cir. 2016) .......................................................24

*Burlington N. and Santa Fe Ry. Co. v. White,*
548 U.S. 53, 64, 67-69 (2006) ........................................................24, 25

*Cole v. Bd. of N. Ill. Univ.,*
838 F.3d 888, 901 (7th Cir. 2016) .......................................................24

*Commercial Underwriters Ins. Co. v. Aires Envtl. Servs., Ltd.,*
259 F.3d 792, 799 (7th Cir. 2001) .......................................................18

*David v. Bd. of Trustees of Cmty. Coll. Dist. No. 508,*
846 F.3d 216, 224 (7th Cir. 2017) .......................................................19

*DEF. EX. Activities Corp. v. Brown,*
851 F.2d 920, 923 (7th Cir. 1988) .......................................................18

*Dunn v. Wash. City Hospital,*
429 F.3d 689, 692 (7th Cir. 2005) .......................................................28

*Fane v. Locke Reynolds, LLP,*
480 F.3d 534, 539, 540 (7th Cir. 2007) ...........................................20, 25

*Garcia v. SigmaTron,*
842 F.3d 1010, 1021 (7th Cir. 2016) ....................................................24

*Hague v. Thompson,*
436 F.3d 816, 823 (7th Cir. 2006) .......................................................21

*Hart v. Mannia,*
798 F.3d 578, 596 (7th Cir. 2015) ................................................... 27-28

*Heath v. Indianapolis*,
    889 F.3d 872, 874 (7th Cir. 2018) ................................................................24

*Hosick v. Chicago State Univ. Bd.*,
    924 F. Supp. 2d 956, 977 (N.D. Ill. 2013) ....................................................25

*Hossack v. Floor Covering*,
    492 F.3d 853, 860 (7th Cir. 2007) ........................................................... 18-19

*Hottenroth v. Village of Slinger*,
    388 F.3d 1015, 1030 (7th Cir. 2004) ............................................................28

*Hutt v. AbbVie Products*,
    757 F.3d 687, 694 (C.A. 7 (Ind) 2014) .........................................................25

*Igasaki v. Illinois Dep't of Fin. & Pro. Regul.*,
    988 F.3d 948, 958, 959 (7th Cir. 2021) ........................................21, 22, 23, 27

*Johnson v. Advocate Health*,
    892 F.3d 887, 894-95 (7th Cir. 2018) ...........................................................19

*Lewis v. Wilkie*,
    909 F.3d 858, 866 (7th Cir. 2018) ........................................................... 22-23

*Logan v. City of Chicago*,
    4 F.4th 529, 538 (7th Cir. 2021) ...................................................................23

*Longstreet v. Ill. Dep't of Corrs.*,
    276 F.3d, 379, 384 (7th Cir. 2002) ...............................................................25

*Lord v. High Voltage*,
    839 F.3d 556, 563 (7th Cir. 2016) ................................................................23

*Matthews v. Waukesha County*,
    759 F.3d 821, 828 (7th Cir. 2014) ................................................................26

*McCann v. Iroquois Mem'l Hosp.*,
    622 F.3d 745, 751 (7th Cir. 2010) ..............................................................18

*McDonnell Douglas Corp. v. Green*,
    411 U.S. 792 (1973) ................................................................................19, 23

*Nichols v. Michigan City*,
    755 F.3d 594, 599 (7th Cir. 2014) ................................................................17

*Nichols v. S. Ill. U.,*
    510 F.3d 772, 779 (7th Cir. 2008) ...........................................................20

*Oest v. Ill. Dep't of Corrs.,*
    240 F.3d 605, 613 (7th Cir. 2001) ...........................................................25

*Oliver v. Joint Logistics Managers, Inc.,*
    893 F.3d 408, 412 (7th Cir. 2018) ...........................................................19

*Oncale v. Sundowner,*
    523 U.S. 75, 81 (1998) ...........................................................................27

*Ortiz v. Werner Enterprises, Inc.,*
    834 F.3d 760, 764-766 (7th Cir. 2016)...............................................19, 23

*Peirick v. Indiana,*
    510 F.3d 681 (7th Cir. 2007) ..................................................................22

*Perez v. Thorntons, Inc.,*
    731 F.3d 699, 709 (7th Cir. 2013) ...........................................................25

*Richards v. U.S. Steel,*
    2015 WL 1598081, at *4 (S.D. Ill. Apr. 9, 2015) ...................................18

*Robinson v. Perales,*
    894 F.3d 818, 828-829, 830 (7th Cir. 2018)............................................23

*Rowlands v. United Parcel,*
    901 F.3d 792, 801 (7th Cir. 2018) ...........................................................23

*Silverman v. Bd. of Ed.,*
    637 F.3d 729, 738 (7th Cir. 2011) ...........................................................21

*Simpson v. Beaver Dam,*
    780 F.3d 784, 789-90 (7th Cir. 2015).......................................................17

*Sinha v. Bradley Univ.,*
    995 F.3d 568, 574 (7th Cir. 2021) ...........................................................26

*Sitar v. Ind. Dept. of Transp.,*
    344 F.3d 720, 728 (7th Cir. 2003)............................................................23

*Smart v. Ball State,*
    89 F.3d 437, 441 (7th Cir. 1996)..............................................................27

*Spierer v. Rossman,*
  798 F.3d 502, 507 (7th Cir. 2015) ...................................................................17

*Swyear v. Fare Foods Corp.,*
  911 F.3d 874, 885 (7th Cir. 2018) ..................................................................23

*Tomanovich v. City of Indianapolis,*
  457 F.3d 656, 663 (7th Cir. 2006) ..................................................................24

*Uhl v. Zalk Josephs Fabricators, Inc.,*
  121 F.3d 1133, 1137 (7th Cir. 1997) ...............................................................27

*Univ. of Texas v. Nassar,*
  570 U.S. 338, 362 (2013) ..................................................................................24

*Vance v. Ball State,*
  570 U.S. 421, 452 (2013) ..................................................................................27

*Vesey v. Envoy Air, Inc.,*
  999 F.3d 456, 461 (7th Cir.2021) ....................................................................26

*Whittaker v. N. Ill. Univ.,*
  424 F.3d 640, 648 (7th Cir. 2005) ..................................................................25

*Widmar v. Son Chemical,*
  772 F.3d 457, 463-464 (7th Cir. 2014) .......................................................20, 21

## Statutes

42 U.S.C. § 2000(e)-2(a)(1) ......................................................................................18

## Federal Rules

FRCP 56(a) ...............................................................................................................17

**JURISDICTIONAL STATEMENT**

Appellee admits and concedes to jurisdiction herein. To avoid repetition, Appellee agrees with and incorporates herein Appellant's Amended Jurisdictional Statement filed on May 3, 2022, as compliant with Fed. R. App. P28(a)(4) and Cir. Rule 28(a).

**STATEMENT OF THE ISSUES**

**Preface**

Bragg asserts unlawful discrimination and retaliation on the basis of her race (Black) resulting in the termination of her employment and her transfer to Hartsfield. In support of her allegations, Bragg asserts the cat's paw theory of liability, asserting that biased subordinates (her preceptors) harbored a racially discriminatory animus against her and that such subordinates' contrived a scheme which proximately caused the decision makers Kranz and Meyer to terminate Bragg's employment. A Statement of the Issues to be addressed are therefore as follows:

1.  **Title VII race discrimination.** Did Bragg present admissible evidence sufficient to establish genuine issues of fact for trial that her race was a motivating factor in the decision by Kranz and Meyer to terminate her employment and were Kranz and Meyer's legitimate, non-discriminatory reasons for termination a pretext for racial discrimination.

2.  **Retaliation.** Did Bragg present admissible evidence sufficient to establish genuine issues of fact for trial that she engaged in a protected activity by complaining that she was subjected to racial discrimination and that such complaints directly caused (but for standard of causation) a materially adverse employment action, to wit: the decision to terminate her employment by Kranz and Meyer.

3.  **Cat's paw theory of liability.** Did Bragg present admissible evidence sufficient to establish

genuine issues of fact for trial that her preceptors harbored a racially discriminatory animus against her and that they used the decision makers Kranz and Meyer as a dupe in a deliberate scheme to proximately cause Kranz and Meyer to terminate Bragg's employment.

## STATEMENT OF THE CASE

### I.     Statement of the facts.

**Bragg's hire by Community and her 90 day Nurse orientation process.**

Appellant, Catrina Bragg (Bragg), an African American (Black) Registered Nurse with no prior healthcare experience, commenced employment with Appellee, Community Hospital (Community), on September 10, 2018. (Dkt. 36-3, p. 91 ¶ 16) Bragg was thereafter separated from employment on December 12, 2018 pursuant to her failure to successfully progress and complete her mandatory initial 90 day orientation period, which is a requirement for continued employment. (Dkt. 36-3, p. 127 ¶ 5, p. 131 ¶ 29) Three experienced Registered Nurses within Bragg's department were assigned as her preceptors to provide guidance and instruction during orientation, to wit: Erin Wysocki, RN (Wysocki), Brittany Arrigo, RN (Arrigo) and Kim Raddatz (Raddatz), as well as Daniel Heredia (Heredia) from the Education Department, Director of Nursing Carla Meyer, RN (Meyer) and Department Nurse Manager Samantha Kranz, RN (Kranz). (Dkt. 36-3, p. 91 ¶ 17) Kranz and Meyer made the decision that, due to her deficient progress and performance during orientation, Bragg would not move forward as a regular staff member and would be separated from employment. (Dkt. 36-3, pp. 92-93 ¶ 25) Although subject to termination, Bragg was accommodated and allowed to transfer to Hartsfield Village (Hartsfield), an affiliated continuing care retirement facility. (Dkt. 36-3, p. 92 ¶ 24, p. 94 ¶ 31) Heredia, Wysocki, Arrigo and Raddatz are not members of Community's management and had no management or supervisory authority over Bragg as an

orientee. (Dkt. 36-3, p. 103 ¶ 43, p. 107 ¶ 15, p. 113 ¶ 15, p. 121 ¶ 15) Kranz and Meyer, members of management, were the decision makers in respect to Bragg's termination, which Bragg admits. (Dkt. 36-2, p. 59)

**Various events and statements related to Wysocki, Arrigo and Raddatz offered by Bragg to establish racial discrimination and retaliation.**

Bragg, in pp. 5-11 and pp. 20-21 of her Brief, alleges various events and statements by her preceptors in support of her claim of racial discrimination and retaliation. Note, the statement "Bragg admits" refers to Bragg's sworn deposition testimony. (Dkt. 36-2, pp. 1-112) These allegations are individually addressed by Community as follows:

**MIDAS Report prepared for Bragg's narcotics error. (Bragg Brief pp. 8-9)**

Bragg admits that a MIDAS Report is not an adverse employment action and merely provides medical information regarding certain events as a tool to improve patient safety and the quality of patient care. (Dkt. 36-2, p. 51; Dkt. 36-3, p. 135 ¶¶ 48-50) Submitting a MIDAS Report is determined on a case by case basis depending upon the events that occurred. (Dkt. 36-3, p. 135 ¶¶ 48-50, p. 144 ¶¶ 44-46) Bragg admits that she committed an error in giving a higher dose of narcotics to a patient than prescribed and that the MIDAS Report was appropriately issued to her. (Dkt. 36-2, pp. 76-77, p. 81) Bragg admits that she received no disciplinary action or adverse employment action regarding this report. (Dkt. 36-2, p. 51) Bragg asserts that on one occasion Raddatz told her that she gave medication through a patient's IV instead of the buttocks, but no MIDAS report was prepared. This is a completely different occurrence from Bragg's narcotics error and Bragg presents no evidence that a MIDAS report was warranted for Raddatz. Also, Bragg was a new Nurse in orientation and Raddatz was her preceptor. (Dkt. 36-3, pp. 59-60)

3

**Wysocki assignment of patients during first five days of orientation. (Bragg Brief pp. 5-6)**

Bragg asserts that she was assigned to patients by Wysocki based upon the patient's race (Bragg Brief p. 5, p. 20), which is refuted by her own deposition testimony. Bragg admits that patients are assigned by the Charge Nurse or Nurse Manager and not by Wysocki. (Dkt. 36-2, pp. 52-53, p. 109 ¶ 27) Bragg admits that she was first scheduled to see patients on 9-26-18 and that, through 10-1-18, she was assigned only two patients during these five days, one Latino and one Black. (Dkt. 36-2, pp. 101-103)  Bragg admits that after 10-1-18 and through the end of her orientation she had no complaints or issues as to the racial designation of patients to whom she was assigned. (Dkt. 36-2, p. 103) The racial designation of a patient was irrelevant to Wysocki and at no time did she assign patients to Bragg or remove a patient from Bragg's care based upon the patient's race (Dkt. 36-3, pp. 108-109, ¶¶ 26-28) and Bragg has not refuted this fact. The record is void of any evidence or statement by Wysocki that she assigned patients to Bragg based upon race and this is mere speculation by Bragg.  Bragg presents no evidence as to the percentage of patients that were Black and/or Latino at the time of such assignment. In respect to the allegation that Wysocki took over the care of a White patient, Bragg could not recall the medical condition of the patient and did not know what treatment was required for the patient. (Dkt. 36-2, p. 73) Bragg could only assert her opinion that the patient was in stable condition. (Dkt. 36-2, p. 74)

**Wysocki was harsh and yelled at Bragg. (Bragg Brief p. 6)**

Bragg asserts that Wysocki blamed her and yelled at her when an IV bag came off a bag of fluids. (Bragg Brief p. 6, p. 21) Bragg does not present any evidence that Wysocki committed this conduct on the basis of Bragg's race and no statements were made by Wysocki to that effect. Wysocki denies the allegation that she was harsh or inappropriate with Bragg. (Dkt. 36-3, p. 109)

Bragg does not assert any tangible adverse employment action as a result of this. Bragg refers to a zero tolerance policy (Bragg Brief p. 6), but same does not exist in the record. Bragg presents a hearsay statement that an employee Musson said a detached IV was "not a big deal" and that no one yelled at Musson when it happened to her. (Bragg Brief p. 6) Bragg does not disclose Musson's race or who was present that could have "yelled at her". This statement offers no relevant evidence.

**"Rap music" played by Arrigo. (Bragg Brief pp. 7-8)**

    Bragg asserts that Arrigo played "rap or hip-hop music" in her presence. (Bragg Brief p. 8, p. 20) Arrigo did not play any music in Bragg's presence for the purpose of making reference to Bragg's race. (Dkt. 36-3, p. 116, ¶¶ 34-36) Bragg has not refuted this fact. Bragg admits in her deposition that she does not know the music that Arrigo played when Bragg was not present (Dkt. 36-2, p. 84, pp. 108-109) and cannot identify the songs that she portrays as rap or hip-hop. (Dkt. 36-2, p. 83) Bragg in her Brief incorrectly asserts that Arrigo denies knowledge of what is meant by rap or hip hop music. (Bragg Brief p. 22). Arrigo's Affidavit (Dkt. 36-3, p. 116 ¶ 36) however states "I am not sure exactly what Bragg is describing as rap or hip hop music, but I have not played this type of music in her presence, nor any music for the purpose of making reference to her race." This fact has not been refuted by Bragg.

**Statement by Arrigo comparing patient's limb to a "skinny brown stick". (Bragg Brief p. 7)**

    Bragg asserts that Arrigo made the statement that a Black patient's limb looked like a "skinny brown stick". (Bragg Brief p. 7, p. 20) Arrigo believes that she did not make such a statement. (Dkt. 36-3, p. 116 ¶¶ 37-38) This alleged statement was made about a patient with no reference to Bragg or race and Bragg admits that she does not know if the alleged statement was made in the patient's presence. (Dkt. 36-2, p. 108) Bragg admits that she only assumed that the statement referred to the

patient's race and that Arrigo never related such statement to the patient's race or to Bragg's race. (Dkt. 36-2, p. 106)

**Raddatz statement regarding oxygen cord wrapped around patient's neck. (Bragg Brief p. 11)**

Bragg alleges that, on 12-12-18, an oxygen cord was wrapped around a Black patient's neck and that Raddatz stated "woah, let's not have a hanging tonight". (Dkt. 36-2, p. 90, p. 104) Raddatz does not believe that she made this statement and certainly did not make any reference to "hanging" based upon or related to the patient's race. (Dkt. 36-3, p. 124 ¶ 36)  Bragg admits that Raddatz did not mention or make any reference to race when she made this alleged statement. (Dkt. 36-2, p. 90) There was no complaint by Bragg regarding this alleged occurrence, only a statement by Bragg to Raddatz that "I can't believe I just heard that". (Dkt. 36-3, p. 66)

**Nurses Mocking Black speech. (Bragg Brief p. 7)**

Bragg alleges that other White nurses would "mimic and mock the speech" of Black patients. (Bragg Brief p. 7, p. 20)  However, Bragg admits in her deposition that only Arrigo, Raddatz and Lopez made these alleged statements. (Dkt. 36-2, pp. 90-91) In reference to the actual statements made, Bragg further admits in respect to mocking Black speech only that (1) Arrigo stated that a patient's limb looked like a skinny brown stick, (2) that Raddatz made a statement regarding hanging when an oxygen cord was wrapped around a patient's neck and (3) that Lopez used foul language in the workplace, but not directed to Bragg or making reference to race. (Dkt. 36-2, pp. 90-91) Bragg identifies these as the only statements that she alleges were mimicking and mocking the speech of Black patients. (Dkt. 36-2, p. 91) Bragg's broad statement in her Brief (p. 20) that Wysocki, Arrigo and Raddatz "openly demonstrated their racial animus toward Black people in Ms. Bragg's presence" is hardly supported by the evidence herein.

**Raddatz unduly harsh with patients. (Bragg Brief pp. 9-10)**

Bragg alleges that Raddatz was harsh with patients and forced patients to take medication involving two occurrences (Bragg Brief pp. 9-10) and admits that both patients were White. (Dkt. 36-2, pp. 98-99) Raddatz denies this allegation of harsh treatment or improperly forcing medications to patients. (Dkt. 36-3, p. 123 ¶ 32) This accusation obviously has no relevance to Bragg or her allegations of racial discrimination. Bragg does not submit evidence through personal knowledge the circumstances or medical necessity for such alleged force by Raddatz in administering medications. Bragg provides no information as to whether or not Raddatz was counseled or received a Corrective Action for such alleged occurrence.

**Bragg distracted by Raddatz who purportedly wanted Bragg fired. (Bragg Brief p. 9)**

Bragg alleges that Raddatz distracted her by clapping her hands, stomping her feet and marching in place (Bragg Brief p. 9),  which has no relationship to Bragg's race and the record is void of any statement by Raddatz to that effect. Bragg asserts in her Brief (p. 9) that she was regularly hit by Raddatz on the arm, yet Bragg admits that the purported distraction and annoyance by Raddatz occurred on only two occassions. (Dkt. 36-2, p. 93) Raddatz did not intimidate or improperly distract Bragg and was not hostile toward her. (Dkt. 36-3, p. 123 ¶ 33, p. 124 ¶ 34) Bragg presents no evidence establishing that the purported distractions by Raddatz were due to or based upon Bragg's race or whether Raddatz exhibited similar conduct to other orientees.

Bragg also alleges that Raddatz was putting inaccuracies in the Post Conference Reports (Bragg Brief p. 8, p. 10) (Dkt. 36-3, pp. 23-31) in order to get Bragg fired, but there were no references made to race as the reason why Raddatz purportedly wanted Bragg fired, only Bragg's speculation. In allegedly reporting this to Kranz, Bragg submits no evidence that she reported that

her race was the reason for such alleged conduct. Bragg presents no admissible evidence establishing that the purported inaccuracies in Post Conference Reports were due to or based upon Bragg's race.

**Bragg's orientation progress forms.**

The team of persons involved in Bragg's orientation were preceptors Wysocki, Arrigo and Raddatz, Educator Heredia, Director of Nursing Meyer and Nurse Manager Kranz, all of whom who were Registered Nurses. (Dkt. 36-3, p. 91, p. 98, p. 128, p. 138) As part of orientation, Orientee Progress Forms are prepared by the preceptors to evaluate and score progress, which for Bragg were submitted by Wysocki on 10-1-18 (Dkt. 36-3, p. 24), by Arrigo on 10-22-18 (Dkt. 36-3, p. 26), by Raddatz on 11-26-18 (Dkt. 36-3, pp. 28-29) and again by Raddatz on 12-9-18 (Dkt. 36-3, p. 31). Bragg's orientee progress scores were very low, generally 12 or 14 out of a possible 25 and her last score was extremely low for that stage of her orientation (12 out of 25) and reflected a failure to progress to the appropriate level of performance. (Dkt. 36-3, p. 129 ¶¶ 15-16, p. 139 ¶¶ 15-16, p. 24, p. 26, pp. 28-29, p. 31) The most significant part of an orientee's progress score and evaluation is toward the end of the 90 day orientation when it must be determined whether the orientee is successful and will become a regular staff member. (Dkt. 36-3, p. 101 ¶ 31, pp, 133-134 ¶ 40, p. 143 ¶ 36)

**Bragg's orientation progress meetings.**

Orientation progress meetings are conducted for each orientee, usually biweekly, for the purpose of discussing and reviewing the orientee's performance, progress, problems and incidents that warrant attention. (Dkt. 36-3, p. 99, p. 129, p. 139) Performance is discussed and evaluated with direction and guidance regarding future performance and improvement, whereupon meeting reports for Bragg were prepared by Heredia to describe the meeting. (Dkt. 36-3, p. 98, p. 128, p. 138) The

six progress meetings for Bragg are as follows:

The report of the first progress meeting on 10-1-18 (Dkt. 36-3, p. 33) attended by Bragg, Wysocki, Arrigo and Heredia accurately describes the statements made and the level of Bragg's performance on that date. (Dkt. 36-3, pp. 99-100 ¶¶ 17-19, p. 108 ¶¶ 19-25, p. 114 ¶¶ 19-23) As noted therein, Bragg needed to continue to get used to the medical computer system, IV pumps and different fluids; Bragg needed to focus on improving morning medical pass and time management and to take less time to complete assessments and charts on two patients, which was taking 45 minutes instead of 25 to 30 minutes, as well as the need to manage IV (intravenous) tubing and infusions; Bragg also demonstrated poor time management and was not making sufficient progress. (Dkt. 36-3, p. 108 ¶¶ 22-25, p. 33)

The report of the progress meeting on 10-22-18 (Dkt. 36-3, p. 35) attended by Bragg, Arrigo, Kranz and Heredia accurately describes the statements made and the level of Bragg's performance on that date. (Dkt. 36-3, pp. 99-100 ¶¶ 19-20, p. 129 ¶¶ 18-19, p. 114 ¶ 22, pp. 129-130 ¶¶ 18-19) As noted, Bragg needed to continue to work on her charting, improve her time management and her medication administration, as well as recognizing and processing new orders and demonstrating an awareness of work flow. (Dkt. 36-3, p. 114 ¶ 24, p. 35)

The report of the next progress meeting on 11-1-18 (Dkt. 36-3, p. 37) attended by Bragg, Arrigo, Kranz and Heredia accurately reflects the statements made and the level of Bragg's performance on that date. (Dkt. 36-3 p. 100 ¶¶ 21-22, p. 130 ¶¶ 20-21, pp. 114-115 ¶¶ 25-28) As noted, there were numerous areas of concerns by Arrigo and others with Bragg's recognition of critical potassium levels, IV lasix standards and comfort with insulin administration, as well as knowing the difference between the drugs levemir and novolog. All present were concerned about

Bragg's comfort with military time. (Dkt. 36-3, p. 115 ¶¶ 26-28, p. 37) Bragg needed to review what is being done before doing it and must keep better track of new lab results. (Dkt. 36-3, p. 37)

The report of the next progress meeting on 11-9-18 attended by Bragg, Meyer, Kranz and Heredia (Dkt. 36-3, p. 39) accurately describes the statements made and the level of Bragg's performance on that date. (Dkt. 36-3, p. 100 ¶¶ 23-24, p. 130 ¶¶ 23-24, p. 139 ¶¶ 18-19, p. 115 ¶¶ 29-32) As noted, Bragg's progress was below expectation at this time and there were concerns about knowledge and patient safety and the  medication error that Bragg committed on 11-7-18 where an incorrect dose of narcotics was given to a patient was addressed (Dkt. 36-3, pp. 115-116 ¶¶ 29-33), which narcotics error Bragg admits. (Dkt. 36-2, pp. 46-47) Also as noted, Bragg was confused about the proper dosage of a dangerous narcotic and Bragg informed a patient that a drug was highly addictive when it was not. (Dkt. 36-3, pp. 115-116) Bragg at this stage was found to be very slow in learning proper procedures, had difficulty in serving multiple patients, demonstrated poor time management, poor organization, poor critical thinking skills and was not making the progress expected. (Dkt. 36-3, pp. 115-116 ¶¶ 29-33, p. 39)

The report of the next progress meeting on 11-15-18 (Dkt. 36-3, pp. 41-42) attended by Bragg, Meyer, Raddatz, Kranz and Heredia accurately describes the statements made and the level of Bragg's performance. (Dkt. 36-3, p. 100 ¶¶ 25-26, p. 130 ¶¶ 22-23, p. 140 ¶¶ 20-21, p. 122 ¶ 23) As noted, Bragg had many problems and deficiencies at this point and was instructed to complete tasks correctly, including washing her hands, calculating medication dosages, setting up IV poles and tubing and the other items set forth in ¶ 1-7 of this report. (Dkt. 36-3, pp. 41-42, p. 122 ¶¶ 22-26) Bragg's responses at this meeting were concerning, when she stated that she was "bored", that she did not think preparing IV pumps was an issue and that she just "needed her space". (Dkt. 36-3, p.

122 ¶ 25) Bragg at this meeting did note that Raddatz was extremely helpful and laid out everything for her. (Dkt. 36-3, p. 123 ¶ 26)

The report of the next progress meeting on 11-26-18 (Dkt. 36-3, pp. 44-45) attended by Bragg, Meyer, Raddatz, Kranz and Heredia accurately reflects the statements made and level of Bragg's performance on this date. (Dkt. 36-3, pp. 100-101 ¶¶ 27-28, p. 123 ¶¶ 27-30, p. 140 ¶¶ 20-21, p. 130 ¶¶ 24-25) As noted, Bragg was far behind in her progress, needed to make major improvement in numerous areas and was told that the following weeks were critical. (Dkt. 36-3, p. 123 ¶ 28-31) At this point in orientation, Bragg's progress valuation score of 12 out of a possible 25 (Dkt. 36-3, pp. 28-29) was well below what would be expected. (Dkt. 36-3, p. 123 ¶¶ 30-31) In general, Bragg was determined to be very slow in learning proper procedures, had difficulty in serving multiple patients and developing critical thinking skills, demonstrated poor time management and poor organization, required extensive monitoring and did not make the progress that was expected of her at this level of orientation. (Dkt. 36-3, p. 123 ¶ 31, p. 131 ¶ 27, p. 140 ¶ 23)

The foregoing six progress meeting reports (Dkt. 36-3, p. 33, p. 35, p. 37, p. 39, pp. 41-42, pp. 44-45) establish and provide detailed and extensive examples of numerous problems and performance deficiencies during Bragg's orientation. Bragg presents little evidence refuting only a few incidents related to these reports which are noted in her Brief as follows: Bragg denies the singular incident when an IV tube became disconnected from a patient, asserting that it was not her fault. (Bragg Brief pp. 6-7) Bragg denies that she told a patient that the drug Toradol was addictive and she denies that she misunderstood the correct dosage for fentanyl. (Bragg Brief p. 8) Bragg denies that she made a medication error, which she blames on a computer error. (Bragg Brief p. 10, p. 29) Other than these few singular incidents, Bragg does not refute through admissible evidence

11

the remaining extensive content of these progress meeting reports and, as stated above, she personally attended each of these progress meetings from 10-1-18 through 11-26-18, which attendance she does not dispute, and she personally heard the statements and comments at these meetings, which she does not dispute. Heredia, Wysocki, Arrigo and Raddatz have all verified that Bragg's race was not a factor in their actions or decisions and they did not treat Bragg in a discriminatory manner based upon her race. (Dkt. 36-3, p. 102 ¶ 34, p. 107 ¶ 14, p. 113 ¶ 14, p. 116 ¶ 39, p. 121 ¶ 14, p. 124 ¶ 37)

**Bragg's evaluation of her preceptors.**

During her orientation, Bragg prepared an evaluation for each of her preceptors for a total of three evaluations. (Dkt. 36-3, p. 101 ¶ 32) Bragg's evaluation of Wysocki dated 10-11-18 (Dkt. 36-3, p. 18) reflects a score of 11 out of 15 noting that Wysocki's attitude was interested and appropriate, that Wysocki showed adequate communication skills with valid feedback and that she selected patients that met Bragg's needs. (Dkt. 36-3, p. 18) Bragg's evaluation of Arrigo dated 10-22-18 (Dkt. 36-3, p. 20) and her evaluation of Raddatz dated 11-26-18 (Dkt. 36-3, p. 22) both reflected a very high score of 14 out of 15 showing that, in Bragg's opinion, Arrigo and Raddatz maintained an attitude that was very positive, helpful and motivating and demonstrated exceptional communication skills with effective feedback and evaluation. Bragg asserts that these evaluations related only to the day of the evaluation (Bragg Brief p. 14), even though each evaluation covered the entire preceptorship of the preceptor evaluated. (Dkt. 36-3, p. 101 ¶ 32) These evaluations directly refute Bragg's accusations regarding the conduct of her preceptors. Significantly, Bragg has not produced any other evaluations during the entire time of her preceptorship, including unfavorable evaluations while claiming that these three evaluations were only for single days.

**Similarly situated Registered Nurse orientation comparators.**

Commencing 1-1-17 through 2-10-21, only one other Registered Nurse failed to successfully complete her orientation in Bragg's unit 4 South Renal, to wit: Mary Anderson (White), who commenced orientation on 9-10-19, was separated from employment for deficient performance pursuant to the decision of Meyer and Kranz and, unlike Bragg, Mary Anderson did not obtain transfer to another position. (Dkt. 36-3, p. 94 ¶ 33, p. 102 ¶ 35, p. 133 ¶ 39, p. 143 ¶ 35) Anderson's progress scores were very low (11.5 and 14.5 out of 25) reflecting deficient performance (Dkt. 36-3, p. 147, pp. 149-150) and these were scores similar to Bragg's progress scores which were generally 12 or 14 out of 25. (Dkt. 36-3, pp. 23-31)

Commencing 1-1-17, only two Black Registered Nurses other than Bragg entered Bragg's 4 South Renal unit and went through orientation, to wit: Shevon Henderson RN and Jessica Ezell RN. (Dkt. 36-3, p. 94 ¶¶ 33-36, p. 134 ¶¶ 42-47, p. 143 ¶¶ 38-43) Shevon Henderson commenced orientation on 7-10-18 about the same time as Bragg, received progress scores of 17, 18 and 20 and pursuant to the decision of Meyer and Kranz was successful and became a regular staff member. (Dkt. 36-3, p. 94, p. 134 ¶¶ 42-44, p. 143 ¶¶ 39-40) Jessica Ezell commenced orientation on 1-7-20, received progress scores of 18 and pursuant to the decision of Meyer and Kranz successfully completed orientation and became a regular staff member. (Dkt. 36-3, p. 94, pp. 134-135 ¶¶ 45-46, p. 144 ¶¶ 41-42) Raddatz served as a preceptor for Shevon Henderson during her successful orientation. (Dkt. 36-3, p. 135 ¶ 47) Also note that Kranz interviewed Bragg and approved her hiring only three months prior to Bragg's transfer. (Dkt. 36-2, p. 21) which also refutes a racial animus in Kranz's decision regarding Bragg's termination.

13

**Kranz and Meyer's review of Bragg's performance and determination that she did not successfully complete her orientation.**

As stated above, Kranz personally attended five of the progress meetings from 10-22-18 through 11-26-18 and Meyer personally attended three of the progress meetings from 11-9-18 through 11-26-18. A great amount of information pertaining to Bragg's problems and lack of progress were reported and discussed at these meetings, which, as stated above, (Community Brief pp. 8-11) Kranz and Meyer attended. Kranz and Meyer verified that these meeting accurately described the meeting conducted, the persons present, the statements made and the level of Bragg's performance. At no time did Kranz or Meyer treat Bragg unfairly based upon her race and they only regarded her job performance and orientation progress. (Dkt. 36-3, p. 129 ¶ 14, p. 139 ¶ 14) Kranz and Meyer found and honestly believed that, during the orientation process, Bragg was generally very slow in learning proper procedures, had difficulty in serving multiple patients, demonstrated poor time management, poor critical thinking skills and did not make the progress that was expected and required during the orientation process, thereby failing to successfully complete her mandatory 90 day orientation period. (Dkt. 36-3, p. 131 ¶ 27, p. 140-141 ¶ 23) Kranz and Meyer did confer with Bragg's preceptors and Heredia regarding Bragg's deficiencies and lack of progress in addition to their own personal observations and attendance at the orientation progress meetings and they both made the decision honestly, fairly and independently that Bragg was not successful in the completion of her orientation. (Dkt. 36-3, p. 131 ¶¶ 28-29, pp. 140-141 ¶¶ 24-25) Bragg presents little evidence refuting only a few incidents contained in these progress reports (Community Brief p. 11) and Bragg presents no evidence that at any of these progress meetings she spoke directly to the persons present about alleged inaccuracies other than the few described in her Brief.

Bragg admits that Kranz and Meyer made this decision to terminate her employment. (Dkt.

36-2, p. 59) Bragg also admits that her Position Description (Dkt. 36-3, pp. 11-16) contains the duties of her position, including, but not limited to, completing tasks promptly and accurately, being trusted to follow through on assignments and manage time effectively. (Dkt. 36-2, pp. 22-24) Bragg also admits that she had to successfully complete her 90 day orientation during which her performance would be evaluated in order to continue her employment. (Dkt. 36-2, p. 23)

Kranz and Meyer honestly believed that Bragg's performance during her orientation was very deficient, which decision was reached independently by Kranz and Meyer without regard to any criteria or reason other than Bragg's deficient orientation progress and job performance. (Dkt. 36-1, p. 12; Dkt. 36-3, p. 131,  p. 141) It is also important to note that Kranz and Meyer did not terminate Bragg's employment, but rather separated her from employment with Community and allowed her to transfer to the Hartsfield facility. Without support, Bragg incorrectly asserts in her Brief (p. 21) that nurses at Hartsfield are "overwhelmingly Black". However, Bragg only presents evidence in respect to her transfer that "most" of Community's nursing staff are White and most of the Hartsfield nursing staff are Black. (Dkt. 43-1, p. 10) This offers no evidentiary value in respect to a transfer being based upon race in that "most" refers only to 51% or more.

Meyer and Kranz met with Bragg on 12-12-18, discussed her performance deficiencies and advised Bragg that she did not successfully complete her orientation. (Dkt. 36-3, p. 132 ¶ 32, p. 141 ¶ 28) Due to Bragg's unsuccessful completion of orientation, she would be subject to termination, but Meyer and Kranz upon consultation with Brandt wanted to find a way to accommodate Bragg and transition her into a position less demanding and stressful than the Acute Care position to which she was hired. (Dkt. 36-3, p. 131 ¶ 30, p. 141 ¶ 26) At this meeting, Kranz and Meyer proposed transfer to Hartsfield, a continuing care retirement facility which in their opinion and their belief

would be less demanding with a slower pace than her acute care position and more accommodating to Bragg's problems with organization, time management and critical thinking. (Dkt. 36-3, p. 132 ¶ 31 ¶ 33, pp. 141-142 ¶ 27 ¶ 29 ) Pursuant to this meeting, Bragg voluntarily filled out and signed a transfer form (Dkt. 36-3, p. 82) reflecting her consent to transfer to Hartsfield (Dkt. 36-3, p. 93 ¶ 27, p. 133 ¶ 35, p. 142 ¶ 31). Bragg denies her voluntary transfer, stating that she was forced. (Bragg Brief p. 12) Bragg's statement in her Brief (p. 15) that she was so proficient that Hartsfield cut her mandatory orientation short is simply not supported by the record before this court.

## II.    Proceedings in the District Court.

Bragg filed her Complaint in the U.S. District Court, Northern District of Indiana on May 31, 2019. (Dkt. 1) Bragg alleged violations of Title VII arising from unlawful discrimination on the basis of race and unlawful retaliation for protected activities. At the close of discovery, Community filed a Motion for Summary Judgment on all counts (Dkt. 35), which Motion was granted by the District Court with judgment entered for dismissal of Bragg's suit.

## SUMMARY OF THE ARGUMENT

1.    **Title VI race discrimination.** Community has established legitimate, non-discriminatory reasons for the termination of Bragg's employment and transfer to Hartsfield. Bragg has not presented admissible evidence sufficient to establish genuine issues of fact for trial that her race was a motivating factor in the decision by Kranz and Meyer to terminate her employment and that the reason for termination was a pretext for racial discrimination.

2.    **Retaliation.** Community has established legitimate, non-discriminatory reasons for the termination of Bragg's employment and transfer to Hartsfield. Bragg has not presented admissible evidence sufficient to establish genuine issues of fact for trial that she engaged

in a protected activity by complaining that she was subjected to racial discrimination and that such complaints directly caused (but for standard of causation) a materially adverse employment action, to wit: the decision to terminate her employment by Kranz and Meyer.

3.    **Bragg's cat's paw theory of liability.** Community has established legitimate, non-discriminatory reasons for the termination of Bragg's employment and transfer to Hartsfield. Bragg has not presented admissible evidence sufficient to establish genuine issues of fact for trial that her preceptors harbored a racially discriminatory animus against her and that they used the decision makers Kranz and Meyer as a dupe in a deliberate scheme to proximately cause Kranz and Meyer to terminate Bragg's employment.

## STANDARD OF REVIEW

Summary Judgment shall be granted if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. (FRCP 56(a)) Movant's burden is to demonstrate the absence of genuine issues of material fact and, if accomplished, the burden shifts to the non-moving party to come forward with specific facts showing that there is a genuine issue for trial. *Spierer v. Rossman*, 798 F.3d 502, 507 (7th Cir. 2015). The non-moving party is not entitled to the benefit of inferences that are supported only by speculation or conjecture. *Nichols v. Michigan City*, 755 F.3d 594, 599 (7th Cir. 2014). The ultimate question is whether a reasonable jury could find prohibited conduct. *Simpson v. Beaver Dam*, 780 F.3d 784, 789-90 (7th Cir. 2015). A dispute about a material fact is genuine only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party". *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

**ARGUMENT**

**A.    Bragg's deposition testimony.**

It must first be noted that portions of Bragg's Answers to Interrogatories (Dkt. 36-3, pp. 50-80) and Affidavit (Dkt. 43-1, pp. 1-10) are clarified or directly refuted by Bragg's sworn deposition testimony. References to Bragg's deposition are found at Dkt. 36-2, p. 1-112, as set forth in Community's STATEMENT OF THE CASE hereinabove. The law is well-established that "in general, parties may not 'patch-up potentially damaging deposition testimony' with a contradictory affidavit." *Richards v. U.S. Steel*, 2015 WL 1598081, at *4 (S.D. Ill. Apr. 9, 2015) (citing *Commercial Underwriters Ins. Co. v. Aires Envtl. Servs., Ltd.*, 259 F.3d 792, 799 (7th Cir. 2001)); see also *DEF. EX. Activities Corp. v. Brown*, 851 F.2d 920, 923 (7th Cir. 1988) (noting that almost all affidavits submitted in litigation are drafted by the lawyers rather than by the affiants). The sham affidavit doctrine applies upon a threshold determination of a 'contradiction'. *McCann v. Iroquois Mem'l Hosp.,* 622 F.3d 745, 751 (7th Cir. 2010) (quoting *Commercial Underwriters*, Id. at 799). In contrast, when the change is plausible and "the party offers a suitable explanation such as confusion, mistake, or lapse in memory," a change in testimony affects only its credibility, not its admissibility. *McCann*, Id. at 751. Bragg presents no evidence or assertions in any form that at her deposition she experienced "confusion, mistake or lapse in memory" and her deposition testimony is controlling in clarifying or refuting her other statements.

**B.    Bragg's allegations of racial discrimination resulting in the termination of her employment and transfer to Hartsfield.**

Title VII makes it unlawful for an employer to discriminate against any individual "because of such individual's race". 42 U.S.C. § 2000(e)-2(a)(1). Under Title VII, Pltf. must demonstrate that her race was a motivating factor for an employment decision. *Hossack v. Floor Covering*, 492 F.3d

853, 860 (7th Cir. 2007). At the Summary Judgment phase, the court must determine whether the evidence presented by Pltf. would permit a reasonable fact finder to conclude that the Pltf.'s race (or other proscribed factor) caused an adverse employment action. *Ortiz v. Werner Enterprises*, *Inc.,* 834 F.3d 760, 765 (7th Cir. 2016). *David v. Bd. of Trustees of Cmty. Coll. Dist. No. 508,* 846 F.3d 216, 224 (7th Cir. 2017)*.* The court in Ortiz therefore established the method for the proper analysis of a discrimination claim, as well as a retaliation claim. The burden shifting framework set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973) may assist a Pltf. in establishing that the evidence permits such a conclusion. *David,* Id. at 224. However, the court must ultimately apply the test set forth in *Ortiz* and determine whether the non-moving party (Bragg) produced sufficient evidence to support a jury verdict of intentional discrimination. All evidence belongs in a single pile and must be evaluated as a whole and evidence labeled "direct" and "indirect" is not evaluated differently. *Ortiz*, Id. at 766. The direct and indirect methods are just means to consider whether one fact caused another. *Ortiz*, Id. at 764-65.

Accordingly, the McDonnell Douglas burden shifting analysis is one method to evaluate Bragg's evidence as a whole. The record is void of any evidence establishing the "direct method", an admission of unlawful conduct by Community. To establish a prima facie case of race discrimination under the indirect method, Bragg must show that (1) she is a member of a protected class, (2) she was meeting Community's legitimate expectations, (3) she suffered an adverse employment action, and (4) Community treated similarly situated individuals outside of the protected class more favorably. *Oliver v. Joint Logistics Managers, Inc.,* 893 F.3d 408, 412 (7th Cir. 2018). *Johnson v. Advocate Health*, 892 F.3d 887, 894-95 (7th Cir. 2018). If Bragg establishes a prima facie case of disparate treatment, Bragg would then need to establish that the legitimate, nondiscriminatory

reasons asserted by Community for its actions are mere pretext for discrimination. *Nichols v. S. Ill. U.,* 510 F.3d 772, 779 (7th Cir. 2008).

Bragg is a member of a protected class, but clearly was not meeting Community's legitimate expectations in her job performance and progress through orientation as described and verified in Bragg's progress meeting reports (Dkt. 36-3, p. 33, p. 35, p. 37, p. 39, pp. 41-42, pp. 44-45), which alone verifies this fact. The only adverse employment action sufficient to establish the third prong of this analysis that Bragg could possibly argue is the unsuccessful completion of her orientation, her resulting separation from employment and transfer to Hartsfield. The record is void of any other adverse employment actions sufficient to satisfy this part of the analysis.

As to the fourth prong of this analysis, employees similarly situated in all respects (comparators) would be nurses who went through orientation in Bragg's department with the same decision makers, Meyer and Kranz. "An employee (comparator) is similarly situated to a Pltf. if the two employees deal with the same supervisor, are subject to the same standards, and have engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Fane v. Locke Reynolds, LLP*, 480 F.3d 534, 539, 540 (7th Cir. 2007). A similarly situated employee is one whose performance, qualifications and conduct are comparable in all material respects. *Widmar v. Son Chemical, 772 F.3d 457, 463 (7th Cir. 2014).* The only nurse failing orientation in Bragg's department and subjected to separation by Kranz and Meyer was Mary Anderson (White). Only two other Black nurses in Bragg's department went through orientation and they were successful and continued with their employment as determined by Meyer and Kranz.

Even if Bragg produced sufficient evidence from which a jury could find a prima facie case

of discrimination, the burden shifts to Community to produce evidence of a legitimate, non-discriminatory reason for Bragg's separation. See *Barnes v. Bd. of Trustees of Univ. of Illinois,* 946 F.3d 384, 389 (7th Cir. 2020)*.* The legitimate, non-discriminatory reason for Bragg's separation is established herein, the honest belief in good faith by Meyer and Kranz that Bragg failed to successfully complete her orientation and Bragg cannot establish that such legitimate reason was a pretext for unlawful discrimination. The burden shifts back to Bragg to produce evidence that Community's proffered reason was pretextual and she has not met this burden. Pretext means a dishonest explanation, a lie rather than an oddity or an error. *Hague v. Thompson*, 436 F.3d 816, 823 (7th Cir. 2006). When an employer articulates a plausible, legal reason for its action, it is not the court's province to decide whether that reason was wise, fair or even correct, ultimately, so long as it truly was the reason for its action. *Silverman v. Bd. of Ed.,* 637 F.3d 729, 738 (7th Cir. 2011). *Igasaki v. Illinois Dep't of Fin. & Pro. Regul.,* 988 F.3d 948, 958, (7th Cir. 2021). The Federal Courts are not super-personnel departments that second-guesses facially legitimate employer policies. *Widmar v. Son Chemical*, 772 F.3d 457, 464 (7th Cir. 2014). Pretext is not "just faulty reasoning or mistaken judgment on the part of the employer; it is a lie, specifically a phony reason for some action". *Barnes,* Id. at 389-390. *Argyropoulos v. City of Alton*, 539 F.3d 724, 736 (7th Cir. 2008).

The legitimate, non-discriminatory reasons for terminating Bragg's employment is abundantly established in great detail in the Orientee Progress Forms submitted by her preceptors where Bragg's performance scores were very low, generally 12 or 14 out of a possible 25. This is also established in great detail pursuant to the six orientation progress meetings conducted from 10-1-18 through 11-26-18, which were all attended by Bragg. Bragg disputes only a few events

contained in her progress meeting reports, but fails to refute through admissible evidence the vast majority of the content of such reports and the problems and deficiencies set forth therein. Community has clearly established that Bragg's orientation progress and performance consistently fell below Community's standards and expectations. See *Igasaki,* Id. at 958-959.

Bragg in her Brief (pp. 25-27) cites and discusses at length *Peirick v. Indiana,* 510 F.3d 681 (7th Cir. 2007) as relevant to the issue of pretext herein. This case is readily distinguished from the case at bar. In *Peirick,* the court found Def.'s silence and delay in advising Pltf. regarding the basis for his termination. Bragg, however, was present at every progress meeting and does not dispute through admissible evidence the vast majority of problems and deficiencies which were noted and discussed at such progress meetings while she was present. Also, Bragg admits that she must successfully complete her 90 day orientation or be subject to termination.

Although Bragg alleges that she was "forced" to transfer to Hartsfield, this still is a significant accommodation by Meyer, Kranz and Brandt to allow transfer when failure to successfully complete orientation would result in termination. The comparator Mary Anderson, RN (White) was not afforded this accommodation and was terminated by Kranz and Meyer pursuant to her unsuccessful orientation. Wysocki, Arrigo, Raddatz and Heredia were not members of management, had no supervisory authority and were not decision makers in respect to Bragg's completion of orientation and termination. Meyer and Kranz have established their honest belief in good faith that Bragg was deficient and unsuccessful in orientation and subject to separation which is a legitimate, non-discriminatory reason that Bragg cannot refute.

## C.     Bragg's allegation of retaliation.

There are two ways a Pltf. may prove a prima facie retaliation claim. *Lewis v. Wilkie*, 909

F.3d 858, 866 (7th Cir. 2018). A Pltf. opting for the direct method must prove that (1) Pltf. engaged in an activity protected by statute, (2) Pltf. suffered a materially adverse employment action, and (3) there is a causal link between the protected activity and the adverse action. *Lord v. High Voltage*, 839 F.3d 556, 563 (7th Cir. 2016). *Robinson v. Perales*, 894 F.3d 818, 830 (7th Cir. 2018). *Swyear v. Fare Foods Corp.*, 911 F.3d 874, 885 (7th Cir. 2018). For the first element (statutorily protected activity), the Pltf. must not only have a subjective belief that she opposed an unlawful practice, such belief must also be objectively reasonable, that the complaint must involve discrimination that is prohibited by Title VII (race). *Logan v. City of Chicago*, 4 F.4th 529, 538 (7th Cir. 2021). All evidence in support of a claim of retaliation belongs in a single pile and must be evaluated as a whole. *Ortiz*, Id. at 766.[1] The indirect method of the McDonnell Douglas burden shifting framework may be a way of analyzing retaliation cases which would allow Pltf. to establish a prima facie case by showing that (1) Pltf. engaged in a statutorily protected activity, (2) Pltf. performed her job duties according to her employer's legitimate expectations, (3) Pltf. suffered an adverse employment action, and (4) Pltf. was treated less favorably than similarly situated employees who did not engage in such protected activity. *Sitar v. Ind. Dept. of Transp.,* 344 F.3d 720, 728 (7th Cir. 2003). See *McDonnell Douglas* analysis, Community Brief pp. 19-21, including the issue of pretext. Regardless of which method Pltf. chooses, the court must ultimately consider the evidence as a whole to determine whether the evidence would permit a reasonable fact finder to conclude that retaliatory motive caused the discharge or other adverse employment action. *Igasaki,* Id. at 958-959.

Bragg was not meeting Def.'s legitimate job performance expectations and the only adverse

---

[1]    Although *Ortiz* dealt with discrimination claims, the 7th Cir. has applied its holding in the context of retaliation claims. *Rowlands v. United Parcel*, 901 F.3d 792, 801 (7th Cir. 2018).

employment action that Bragg could possibly argue is the unsuccessful completion of her orientation and resulting separation. Also, the evidence disclosed herein does not establish that Bragg engaged in a statutorily protected activity with specific complaints that she was directly and personally subjected to racial discrimination or facts that her race was a factor.

In retaliation claims, the correct standard in determining causation is the "but-for" standard and not the "motivating factor" standard. *Univ. of Texas v. Nassar*, 570 U.S. 338, 362 (2013). The court must determine whether the protected activity was "the" but-for cause of the employment action. *Heath v. Indianapolis,* 889 F.3d 872, 874 (7th Cir. 2018). A Pltf.'s subjective beliefs are insufficient to create a genuine issue of material fact. *Boss v. Castro*, 816 F.3d 910, 917 (7th Cir. 2016). Speculation or suspicious timing alone is rarely enough to establish a retaliatory motive. *Garcia v. SigmaTron*, 842 F.3d 1010, 1021 (7th Cir. 2016). A statutorily protected activity "requires more than simply a complaint of some situation at work, no matter how valid". *Cole v. Bd. of N. Ill. Univ.*, 838 F.3d 888, 901 (7th Cir. 2016). The complaint by Pltf. must indicate that discrimination occurred because of race or some other protected class and merely complaining in general terms of discrimination or harassment without indicating a connection to a protected class (race) is not sufficient. *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006).

Adverse employment actions in the context of retaliation are "not limited to discriminatory actions that affect the terms and conditions of employment" as in a discrimination claim. *Burlington N. and Santa Fe Ry. Co. v. White,* 548 U.S. 53, 64 (2006). However, a Pltf. must show that the alleged retaliatory action was "materially adverse", meaning that it might well have dissuaded a reasonable worker from engaging in a protected activity. *Burlington*, Id. at 68. Even with this lower standard, petty slights, minor annoyances and simple lack of manners do not suffice. (*Burlington*,

24

Id.) Title VII "protects an individual not from all retaliation, but from retaliation that produces an injury or harm." *Burlington*, Id. at 67.[2]   A Pltf.'s subjective belief that the adverse employment actions were discriminatory or retaliatory is not sufficient to create a triable issue of fact. *Hosick v. Chicago State Univ. Bd.*, 924 F. Supp. 2d 956, 977 (N.D. Ill. 2013). In respect to the issue of causal connection, evidence of an adverse employment action must be linked to a protected activity, not just evidence of problematic hostility. *Hutt v. AbbVie Products*, 757 F.3d 687, 694 (C.A. 7 (Ind) 2014).

Bragg is apparently relying upon various verbal complaints that she allegedly submitted as the "protected activity" in support of her claim of retaliation. Such complaints, at most, amount to allegations of unfairness, harsh conduct or inappropriate statements by her preceptors which are not related to Bragg's race. In respect to actual verbal complaints lodged by Bragg to any member of management, she asserts that she reported Wysocki's harsh conduct towards her and the issue about Wysocki's assignment of patients during the first five days. (Bragg Brief p. 6) There was no reference to race regarding such harsh conduct. Bragg also asserts that she spoke with Kranz about Raddatz's alleged behavior in distracting and annoying Bragg, as well as a general unspecified statement that Raddatz was documenting falsehoods in the orientation evaluations (Bragg Brief p. 10) but Bragg did not reference her race in respect to these assertions. These alleged events are discussed in detail hereinabove. As to the patient race matching allegation, which is pure speculation

---

[2] *Oest v. Ill. Dep't of Corrs.*, 240 F.3d 605, 613 (7th Cir. 2001) (oral reprimands that carry no tangible job consequence are not adverse employment actions); *Longstreet v. Ill. Dep't of Corrs.*, 276 F.3d , 379, 384 (7th Cir. 2002) (negative performance evaluations that did not result in tangible job consequences and were not adverse employment actions); *Fane v. Locke Reynolds, LLP*, 480 F.3d 534, 539 (7th Cir. 2007) ("harder work assignments do not constitute an adverse employment action"). *Whittaker v. N. Ill. Univ.*, 424 F.3d 640, 648 (7th Cir. 2005) (in the context of retaliation, a written reprimand without more is not an adverse employment action). *Perez v. Thorntons, Inc.*, 731 F.3d 699, 709 (7th Cir. 2013) ("Standing alone, biased comments do not establish discriminatory motives unless they were by the decision maker and can be connected to the decision.").

by Bragg, the assignment of one Black and one Latino patient to Bragg during her first five days or the fact that Wysocki may have cared for a White patient provides no evidence or discrimination or racial animus and Bragg does not even present evidence as to the percentage of patients who were Black or Latino at that time. Wysocki has asserted in her Affidavit that no patients have been assigned to Bragg on the basis of the patient's race and Bragg has not refuted this. Of course, as argued herein, Bragg must also prove that such purported complaints were the direct cause (but for causation requirement) for the decision by Kranz and Meyer to terminate her employment. Bragg has not met this burden and the conduct she alleges in her complaints to Kranz amounts to allegations of harsh or unfair treatment that are not directly related to Bragg's race.

**D.     Bragg's unsuccessful attempt to apply the cat's paw theory of liability.**

Typically, a Pltf. must establish discriminatory intent on the part of the decision maker (here Kranz and Meyer). However, in this case, Bragg is proceeding on a cat's paw theory. "This theory applies when a biased supervisor who lacks decision making power uses the formal decision maker as a dupe in a deliberate scheme to trigger a discriminatory employment action." *Vesey v. Envoy Air, Inc.*, 999 F.3d 456, 461 (7th Cir. 2021). See also *Matthews v. Waukeshaw County*, 759 F.3d 821, 828 (7th Cir. 2014). To establish race discrimination under a cat's paw theory, "the Pltf. must present evidence that the biased subordinate actually harbored discriminatory animus against him and that the subordinate's scheme proximately caused the adverse employment action." *Sinha v. Bradley Univ.*, 995 F.3d 568, 574 (7th Cir. 2021). Here, Bragg argues that Wysocki, Arrigo, and Raddatz used their progress forms and information contained in the progress meeting reports to dupe Kranz and Meyer into terminating Bragg's employment. Bragg cannot prevail on her discrimination claim, even under a cat's paw theory, because she has failed to identify sufficient evidence of racial

discriminatory animus, either on the part of Heredia, Wysocki, Arrigo and Raddatz or on the part of Kranz and Meyer. Moreover, Bragg has failed to establish that her preceptors' alleged scheme proximately caused Kranz and Meyer to terminate her employment.

Bragg alleges conduct and statements by Wysocki, Arrigo and Raddatz that essentially are characterized as harsh, unfair or inappropriate, which acts alone are not sufficient to proceed to trial on a discrimination claim. *Igasaki*, Id. at 958. Bragg, however, does not through admissible evidence establish that the reason for such alleged conduct and statements by her preceptors was based upon or related to her race. Bragg would have us assume and speculate that, because she is Black, such alleged conduct or statements by her preceptors constituted racial discrimination based upon a racial animus toward her. Bragg has not established this. Bragg's own suspicions are not enough to survive Summary Judgment. *Uhl v. Zalk Josephs Fabricators, Inc.*, 121 F.3d 1133, 1137 (7th Cir. 1997). ("Facts, not an employee's perceptions and feelings, are required to support a discrimination claim.") Bragg does not allege and nowhere in the record is it found that Wysocki, Arrigo and Raddatz or any other person uttered racial epithets or slurs of any kind, made direct references to Bragg's race, or even stated the words "Black" or "African American". There is nothing in the record to establish through admissible evidence that any statements made or actions taken by Bragg's preceptors were based upon or related to Bragg's race. In respect to the alleged conduct and statements by Bragg's preceptors, Title VII imposes no general civility code. *Vance v. Ball State*, 570 U.S. 421, 452 (2013), quoting *Oncale v. Sundowner,* 523 U.S. 75, 81 (1998). Not everything that makes an employee unhappy is an actionable adverse action. *Smart v. Ball State*, 89 F.3d 437, 441 (7th Cir. 1996). An allegation that a Pltf. was subjected to a "barrage of criticism and work place stresses" are conclusory assertions and do not constitute evidence sufficient to overcome summary judgment. *Hart v. Mannia*,

798 F.3d 578, 596 (7th Cir. 2015). As noted in *Hottenroth v. Village of Slinger*, 388 F.3d 1015, 1030 (7th Cir. 2004), "it is well established that unfulfilled threats that result in no material harm cannot be considered an adverse employment action under Title VII." Statements implying that an employer would do what he could to impede Pltf.'s career does not cause any injury and is not an adverse action. *Dunn v. Wash. City Hospital*, 429 F.3d 689, 692 (7th Cir. 2005). Bragg presents no admissible evidence sufficient to establish genuine issues of fact for trial that her preceptors harbored a racially discriminatory animus against her and that they engaged in a deliberate scheme that proximately caused Kranz and Meyer to terminate Bragg's employment. Bragg only offers speculation and conjecture in this regard. Although Bragg asserts that her termination and transfer to Hartsfield by Kranz and Meyer was incorrect and unwarranted, she does not establish that it was a pretext for racial discrimination.

## CONCLUSION

Pursuant to the foregoing reasons, argument and authority, the District Court's final judgment granting Defendant's Motion for Summary Judgment should be affirmed in all respects.

Dated:  May 20, 2022.

/s/ James E. Daugherty
James E. Daugherty
Counsel for Appellee
Indiana Bar No. 4398-45
Law Offices of James E. Daugherty
8029 Cleveland Place
Merrillville, Indiana 46410
Telephone:  (219) 769-5500
Facsimile: (219) 769-5501
E-Mail:  jdaughertylaw@aol.com

## CERTIFICATE OF COMPLIANCE WITH
## FRAP RULE 32(a)(7), FRAP RULE 32(g) AND CR 32(c)

The undersigned counsel of record for Defendant/Appellee, Community Hospital, furnishes the following in compliance with FRAP Rule 32(a)(7):

I hereby certify that this Brief of Appellee conforms to the rules contained in FRAP Rule 32(a)(7) for a Brief produced with a proportionally spaced typeface in 12 point font with footnotes in 11 point font using Times New Roman font. This Brief does not exceed 30 pages, excluding the parts of the Brief exempted for page count by Federal Rules of Appellate Procedure. Page count from Jurisdictional Statement through Conclusion is 28 pages.

Dated:  May 20, 2022.                              /s/ James E. Daugherty
                                                   James E. Daugherty
                                                   Indiana Bar No. 4398-45
                                                   Counsel for Appellee
                                                   Law Offices of James E. Daugherty
                                                   8029 Cleveland Place
                                                   Merrillville, Indiana 46410
                                                   Telephone:  (219) 769-5500
                                                   Facsimile: (219) 769-5501
                                                   E-Mail:  jdaughertylaw@aol.com

**PROOF OF SERVICE**

The undersigned counsel for Defendant/Appellee, Community Hospital, hereby certifies that, on May 20, 2022, I electronically filed the foregoing Brief of Defendant/Appellee, Community Hospital, with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants of this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated:  May 20, 2022.                    /s/ James E. Daugherty
                                         James E. Daugherty
                                         Indiana Bar No. 4398-45
                                         Counsel for Appellee
                                         Law Offices of James E. Daugherty
                                         8029 Cleveland Place
                                         Merrillville, Indiana 46410
                                         Telephone:  (219) 769-5500
                                         Facsimile: (219) 769-5501
                                         E-Mail:  jdaughertylaw@aol.com